2022 IL App (2d) 210231-U
No. 2-21-0231
Order filed July 18, 2022

**NOTICE:** This order was filed under Supreme Court Rule 23(b) and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

IN THE

APPELLATE COURT OF ILLINOIS

SECOND DISTRICT

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) ) ) | Appeal from the Circuit Court of Winnebago County. |
| Plaintiff-Appellee, | ) ) | |
| v. | ) ) ) | Nos. 17-CF-1700 |
| VAN DOUGLAS RICHARDSON, JR., | ) ) | Honorable Brendan A. Maher, |
| Defendant-Appellant. | ) | Judge, Presiding. |

JUSTICE BRENNAN delivered the judgment of the court.
Justices Jorgensen and Schostok concurred in the judgment.

**ORDER**

¶ 1   *Held*: The trial court did not err in denying defendant's pre-trial motion to dismiss the indictment for first-degree murder. The evidence was sufficient to convict. However, as the State concedes, defendant is subject to a 20-year, not a 25-year, firearm sentencing enhancement. Conviction affirmed. Sentence affirmed as modified.

¶ 2   Defendant, Van Douglas Richardson, Jr., filed a pre-trial motion pursuant to section 114-1(a) of the Code of Criminal Procedure of 1963 (Code) (725 ILCS 5/114-1(a) (West 2018)) to dismiss the 19-count bill of indictment, which included 16 counts for first-degree murder against defendant and co-defendant, Deon Hart. Hart filed a similar motion. Both defendants argued that

the State misled the grand jury when it presented the testimony of an eye-witness, Marshayla Whitlock, and elicited that she had provided the police with a prior consistent statement but did not disclose that she had also provided the police with a prior inconsistent statement. The trial court denied both motions in a single ruling. A jury subsequently convicted defendant of first-degree murder. 720 ILCS 5/9-1 (a)(2), (a)(3) (West 2016). It also determined that defendant personally discharged the firearm that proximately caused the victim's death, making defendant subject to a 25-year sentencing enhancement. 730 ILCS 5/5-8-1(a)(1)(d)(iii) (West Supp. 2017). The trial court sentenced defendant to 40 years' imprisonment, plus the 25-year sentencing enhancement, for a total of 65 years' imprisonment.

¶ 3       On appeal, defendant argues that: (1) the trial court erred in denying his motion to dismiss the indictment[1]; (2) the evidence was not sufficient to convict for first-degree murder; and (3) even if the evidence was sufficient to convict for first-degree murder, it was at best sufficient to establish that defendant, as one of two shooters firing toward the victim, personally discharged a firearm (730 ILCS 5/5-8-1(a)(d)(ii) (West Supp. 2017) (20-year enhancement)), not that he personally discharged the firearm that proximately caused the victim's death (730 ILCS 5/5-8-1(a)(1)(d)(iii) (West Supp. 2017) (25-year enhancement)).

¶ 4       We reject defendant's first two arguments. The State concedes error as to the sentencing enhancement. Accordingly, we affirm defendant's conviction for first degree murder but vacate

---

[1]Co-defendant Hart has filed a similar appeal on this issue. See *People v. Hart*, 2022 IL App (2d) 200702-U. The trial court adjudicated both motions in a single order. As such, both codefendants appeal from the same order, so there is great overlap in our analyses in the two appeals.

the 25-year enhancement and impose, instead, a 20-year enhancement, for a total of 60 years' imprisonment. Conviction affirmed. Sentence affirmed as modified.

¶ 5                                    I. BACKGROUND

¶ 6     On May 24, 2017, two persons fired gunshots from an SUV in the vicinity of an apartment complex on Sablewood Drive in Rockford. Many people were standing outside, and one person, Lester Sanders, was fatally shot as he sought shelter within his apartment. The State believed that defendant, then age 27, drove the SUV from which the shots were fired and that both he and codefendant Hart, then age 22, fired shots from the vehicle while Hart's friend, Whitlock, then age 17, huddled in the backseat. The State charged defendant with multiple counts of first-degree murder.

¶ 7                                    A. Pre-Trial

¶ 8                                1. Grand Jury Testimony

¶ 9     On June 21, 2017, and on August 2, 2017, the State conducted grand jury proceedings, calling Whitlock and Rockford police detective Joseph Danforth.

¶ 10    Whitlock acknowledged that she was presently in custody on a juvenile matter. She testified that she had not received an offer by the State in exchange for her cooperation. Turning to the shooting, Whitlock testified that defendant drove Hart and herself to the Sablewood apartments, where Hart believed he had left his phone. There, Whitlock's friend, "Biff," expressed anger toward Whitlock's group, because they had caused a "commotion" earlier in the day.

¶ 11    Whitlock's group returned to the vehicle, with defendant driving, Hart in the front passenger seat, and Whitlock in the back seat. Whitlock observed that defendant had a gun on his lap. She also observed that Hart had a gun.

¶ 12    As Whitlock's group began to drive away, someone outside the vehicle who Whitlock

could not see yelled "what." Defendant and the person shouted back and forth. Defendant stuck his gun out of the window and started to shoot. Whitlock estimated that defendant fired four shots as she screamed, "No, no, stop." Hart told her to "shut the f*** up," and Hart then sat on the window frame and began to shoot over the roof of the vehicle. Whitlock estimated that Hart fired six shots. The men then continued to fire in all directions as Whitlock "balled up" in the backseat. She did not understand the men's motive: "I didn't want them to just do all this nonsense that they were doing for no reason." When the shooting ended, Whitlock remained in the vehicle for some time. Whitlock described her eventual departure:

> "We were still in the car, and I was stressing the fact that I wanted to get dropped off. And from there we dropped Deon off onto Green, and [defendant] took me to Auburn Manor and told me that if I would say anything to the police that they would kill me and they would put a note by my body noting that they killed me because they were already going to jail for murder."

¶ 13    Whitlock also testified that, on June 14, 2017, she provided a video-recorded statement to police. The statement was, overall, consistent with the testimony she had just given. In the statement, Whitlock had told police that defendant and Hart may have fired 30 to 50 shots, total, and that no one fired back at them. Also on June 14, 2017, Whitlock identified both defendant and Hart from a photo lineup.

¶ 14    Danforth testified, *inter alia*, that, on May 24, 2017, he and other officers had responded to the scene of the crime. Among the witnesses to later provide written statements was Stacey McCaleb. McCaleb stated that, earlier on May 24, 2017, she had been in a fight with Whitlock at the Sablewood apartments (the "commotion" to which Biff would later refer). Then, later that day, she saw Whitlock return to the Sablewood apartments with two black males (who Danforth

believed to be defendant and Hart).

¶ 15    Danforth also testified that, on June 14, 2017, he interviewed Whitlock.  Whitlock informed him that defendant and Hart shot in the direction of the Sablewood apartments for no apparent reason.  This occurred after an unknown person shouted "what" at defendant and Hart.  Whitlock was able to pick out defendant and Hart from a photo lineup.

¶ 16    The grand jury returned a 19-count bill of indictment, which included 16 counts of first-degree murder.  The counts alleged, variously, that defendant was the shooter that proximately caused the victim's death, that defendant fired a gun during the commission of the offense (but not necessarily that he fired the fatal shot), that defendant was accountable for the victim's murder, and that defendant participated in a forcible felony (aggravated discharge of a firearm) and the victim was killed in the course of that felony.

¶ 17                              2. Motion to Dismiss Indictment

¶ 18    On May 29, 2018, defendant moved to dismiss the indictment pursuant to section 114-1(a) of the Code.  725 ILCS 5/114-1(a) (West 2018).  He argued that the State violated his due process rights by misleading the jury.  Specifically, defendant argued that the State misled the jury when it elicited that, on June 14, 2017, Whitlock gave a statement to police that was consistent with her grand jury testimony, in that she implicated defendant and Hart, but failed to disclose that, on May 25, 2017, Whitlock gave a statement to police that was inconsistent with her grand jury testimony, in that she stated that she did not know the shooters.  Defendant did not reference Danforth's testimony.

¶ 19    Hart filed a similar motion to dismiss the indictment.  However, Hart also referenced Danforth's testimony.  The State filed substantively identical responses to defendant and Hart's motion to dismiss, and the trial court heard the motions at a joint hearing.

¶ 20    During the hearing, both defendants contended that *People v. Oliver*, 368 Ill. App. 3d 690, 697 (2006), controlled.  The State, in turn, urged that *People v. Torres*, 245 Ill. App. 3d 297, 300 (1993), was more on-point.  The trial court recognized that, per *Oliver*, the State was not permitted to mislead a grand jury or allow a witness to testify falsely before a grand jury.  The court further recognized that, per *Torres* and unlike at a trial where guilt beyond a reasonable doubt is at issue, the State was not required to present exculpatory evidence to the grand jury.  The court acknowledged that, because the State referenced Whitlock's prior consistent statement but not her prior inconsistent statement, "it had some concerns."  Still, the court believed that what had occurred was more similar to a decision to withhold exculpatory evidence than to outright mislead a grand jury or allow a witness to testify falsely.  As such, the court denied the motions to dismiss the indictments.  The court further indicated that, even if it had granted the motions to dismiss, it would have been with leave to seek reindictment.

¶ 21                                B. Trial

¶ 22    At trial, the State prosecuted defendant for first-degree murder.  As stated, it pursued multiple theories, including that defendant was the shooter that fired the fatal shot, that defendant shot a firearm during the commission of the offense, that defendant was accountable for the victim's death, and felony murder.

¶ 23                         1. The State's Case

¶ 24    The State called three occurrence witnesses: Christine Sanders (the victim's wife), Marshayla Whitlock (the witness who had testified before the grand jury), and Emily Arrington (who happened to be on the grounds of the apartment complex on the day of the murder).  The State also called Shaquaya Sago (defendant's girlfriend and owner of the vehicle from which the shots were believed to have been fired) and several investigators, including Joseph Danforth, Bruce

Voyles, Matthew Gibbons, and Mark Peters.

¶ 25                                    i. Christine Sanders

¶ 26    Christine Sanders, Lester Sanders's wife, testified that she, Sanders, and a friend were watching television in the living room of their apartment. Through the screen door, they watched their children and the children from the neighboring apartment play outside. Then, they heard yelling and arguing outside. There were a lot of people outside. Christine and Sanders realized that "there could be the involvement of a gun." Sanders stepped outside and told his own children to get in the apartment and the neighbor children to go into their apartment. A short while later, Sanders saw that one neighbor child, a little boy, had wandered back outside. Sanders again stepped outside and shouted at the child to get inside. Sanders's voice drew the attention of those causing the commotion. Sanders explained to them that he had only been speaking to the child. Sanders turned around and re-entered his apartment, at which time he was shot through the screen door. Christine could not go to him immediately, because the shooters continued to fire. When the shots stopped, Christine called 9-1-1 and gave Sanders mouth-to-mouth resuscitation until the paramedics arrived.

¶ 27    On cross-examination, Christine agreed that she did not see the shooters. She was not looking outside when the shots were fired, and she did not go outside after the shots were fired.

¶ 28                                    ii. Marshayla Whitlock

¶ 29    Marshayla Whitlock testified that she planned to meet up with Hart and defendant at a mutual friend's house. She had not met defendant before, though she knew him as "Bud." Whitlock stopped at the Sablewood apartments, a few blocks short of her destination when she got into a fist fight with another girl, Stacey McCaleb. Her friend, Biff, happened to live at or near the Sablewood apartments. As such, after the fist fight, Whitlock went into Biff's apartment to

clean herself up.

¶ 30    Hart and defendant then arrived at Biff's apartment.  When Hart, defendant, and Whitlock went back outside, people had gathered around.  The crowd was trying to get Whitlock and McCaleb to fight again, but Whitlock refused.  McCaleb's brother said some words, and Hart drew a gun.  The gun was black with an affixed laser.  According to Whitlock, Hart was not pointing to shoot, but merely to display the gun.  Whitlock calmed Hart down, and she left with Hart and defendant in an SUV.

¶ 31    After driving a short way, Hart noticed that his phone was missing.  Hart, defendant, and Whitlock returned to Biff's apartment.  Biff began to argue with defendant, saying "he didn't need that stuff," *i.e.*, the fighting and the commotion, around his apartment.  Biff was on parole and did not want trouble.

¶ 32    Defendant, Hart, and Whitlock then got back into the SUV.  Defendant sat in the driver's seat, Hart sat in the front-passenger seat, and Whitlock sat behind Hart in the back seat.  Defendant was starting to drive away when Whitlock heard defendant and an unknown person shout the word "what" at each other.  Then, defendant and Hart started shooting.  Defendant shot out of his open window and Hart sat on the window frame and shot over the roof of the SUV.  Whitlock balled up in the back seat and screamed at them to stop shooting.  She did not know whom defendant and Hart were shooting at.  The shooting lasted "a good two to three minutes."

¶ 33    Whitlock first saw defendant with a gun while in the SUV.  The gun was black without an affixed laser.  Following the shooting, Whitlock remained in the SUV with defendant and Hart for another hour.  When she left the SUV, defendant told her that he would kill her if she said anything.

¶ 34    Whitlock testified to two different video-taped statements she had given to police.  In the first statement, given the day after the shooting on May 25, 2017, Whitlock provided as follows.

After her fight with McCaleb, Whitlock began to walk home. She was upset, and two men in a dark SUV, whom she did not know, asked if she was okay. A short while later, she heard about 30 gunshots. She did not know what happened. She did not know who the shooters were, and she denied knowing defendant and Hart. The detectives challenged that assertion, telling her that other witnesses had told them that she had been at the scene with defendant and Hart.

¶ 35    In the second statement, given June 14, 2017, Whitlock provided an account of the incident consistent with her trial testimony and implicated defendant and Hart in the shooting. Whitlock provided that statement to two police officers in the presence of a woman whom she referred to as "mom"; that woman had been her guardian since she was a baby.

¶ 36    Both recorded statements were played for the jury. Whitlock testified that, in the first recording, she had lied. She explained that, at that time, defendant and Hart were not in custody and she was afraid for her life. She acknowledged that, in the second recording, she recently had been arrested in conjunction with her fight with McCaleb and, also, she had been "high" on marijuana. She testified that she was not presently "high."

¶ 37                                  iii. Emily Arrington

¶ 38    Emily Arrington testified that she witnessed the shooting. Prior to the shooting, it had been a very busy and chaotic night, with more than 20 people near the premises of the apartment complex. The people were talking and arguing. She observed the fight between Whitlock and McCaleb. She knew Whitlock but she did not know McCaleb. She saw defendant and Hart outside, but she could not recall whether she saw them before or after Whitlock's fight. She could hear that Hart was shouting, but she could not hear whether he said anything to defendant.

¶ 39    Arrington saw a person shoot a gun from a green SUV. She believed the shooter to be Hart, but she could not be sure, because she only saw the shooter from the back. Arrington agreed,

however, that she had told the police that she had seen Hart perform the shooting from over the roof of the SUV and that she had seen Hart and defendant in the SUV together.

¶ 40 During cross-examination, Arrington first said that she saw defendant driving the SUV. She later said she could not be sure, because Hart obscured her view. She only saw one shooter, Hart.

¶ 41 Arrington provided the police with a statement on September 14, 2017. She did so while in custody on charges of marijuana possession. She agreed to speak about the instant case if Danforth, one of the interviewers, would agree to help her in regard to a different shooting case in which her daughter had been present. Danforth agreed, but, in actuality, he did not help her. At trial, Arrington denied several of her September 14, 2017, statements. She denied stating that Hart pulled out a gun before Sanders tried to get the children inside the apartment building and that Hart shot Sanders with no explanation.

¶ 42                                    iv. Shaquaya Sago

¶ 43 Sago testified that she was presently in custody for failure to respond to a subpoena in the instant case. At the time of the shooting, Sago was dating defendant. She owned a green 1999 Mitsubishi Montero SUV. Defendant had use of the SUV. He had a key, and he did not need to ask to use it. Sago knew that defendant took the SUV on the evening of the shooting, but she did not know where he was going. She herself went to a graduation party. When she returned from the graduation party, there was a note on her door to call a police detective. She did not see her SUV; she later learned that it had already been impounded.

¶ 44 The day after the shooting, the police came to Sago's house, and she gave them permission to search the impounded SUV. In addition, on June 4, 2017, she went to the police station and provided the police with a written statement. She gave the statement one day after finding out that

defendant had been cheating on her. She was six months pregnant with his child at the time and she was mad at him.

¶ 45    In the statement, Sago recounted that, the morning after the shooting, she started to get phone calls from defendant's sister, telling her that there had been a murder and that defendant had done something stupid. When Sago got a hold of defendant, defendant denied being the shooter and told her that Hart did it. However, defendant admitted to Sago that he had been with Hart at the time of the shooting. Sago had seen defendant with a black gun in the past.

¶ 46    Presently, Sago disagreed with certain aspects of her written statement. In particular, Sago denied that defendant ever talked to her about the shooting. Rather, she learned about the shooting from detectives and from Facebook. She explained that, although she signed the written statement, she did not read the statement before signing it. She did not bother to read the statement, because she was mad at defendant.

¶ 47    She agreed, however, that she had signed an acknowledgement that she had read the statement and that the acknowledgement had also been signed by two witnesses.

¶ 48    On cross-examination, Sago testified, contrary to her statement to police, that she had never seen defendant with a gun. Danforth, the detective who had interviewed her, told her that he knew defendant had been cheating on her. Sago believed that Danforth did this to sway her against defendant.

¶ 49                            v. Investigating Officers

¶ 50    Joseph Danforth testified that he interviewed Arrington and Sago. As for Arrington, Danforth testified that he showed Arrington two photo lineups. In the first lineup, she identified Hart as the shooter. In the second lineup, she identified defendant as being in what she believed to be a green jeep SUV with Hart. Further, Arrington told Danforth that Hart had gotten out over

the front-passenger window and shot over the roof of the SUV. Danforth agreed that he had promised Arrington that he would investigate the shooting case in which her daughter had been present, and, contrary to Arrington's testimony, that he had done so. As for his interview with Sago, Danforth acknowledged that he told Sago that he knew defendant was cheating on her. Danforth typed Sago's statement as she spoke. It was his practice to have witnesses read what he had typed before signing a statement.

¶ 51    Bruce Voyles, a Rockford police detective, testified to the security camera video footage that he recovered from the apartment complex. Several different cameras, each of which were set to record upon detecting motion, contained footage of the incident. The footage was shown to the jury. Voyles testified that, based on his training, the footage showed shots being fired from an SUV. "When the vehicle is here you see a small explosion coming from the driver's side of the vehicle." Voyles acknowledged that, in the video, it was unclear whether the SUV was green. (It is clear, however, that the SUV is dark in color.)

¶ 52    Danforth, Voyles, and Matthew Gibbons testified to evidence contained within Sago's SUV. Danforth testified that he responded to the scene. He learned that the suspects' vehicle, a green SUV, was parked nearby on Searles Avenue (Sago's residence). He located the vehicle within one hour of the shooting. It was not hidden in any way. Voyles impounded and processed Sago's SUV. Inside, he found sealed Nicor and ComEd bills addressed to defendant at Sago's address. He also found Sago's insurance papers showing that she owned the vehicle. Gibbons, a Rockford police detective, also processed Sago's SUV. He found a spent, 40-caliber shell casing stuck to the rubber molding above the front passenger door of the SUV. Casings are hot when they are expelled, "[a]nd this casing appeared to have just rolled off the roofline and stuck in that rubber molding." Still, it was not melted into the molding. Gibbons was able to remove the casing

simply by picking it up with his (gloved) fingers. He did not recover any latent fingerprints from the SUV.

¶ 53    Gibbons also processed evidence at the crime scene. By the time Gibbons arrived at the scene, other officers had identified items that they considered to be potential evidence. Gibbons walked through the scene with another officer to mark the items. Gibbons recovered 14 spent shell casings of two different calibers on the street near the shooting. He found two 40-caliber casings and twelve 9-millimeter casings. Gibbons informed the jury that the same firearm cannot discharge two different calibers of casings.

¶ 54    Mark Peters, the forensic pathologist who performed the autopsy testified that Sanders was killed by a single gunshot wound to the left side of his back.

¶ 55                                         2. Defendant's Case

¶ 56    Defendant called Danforth, who had previously testified as a witness for the State, as his only witness. Danforth testified to his interviews of Whitlock and Arrington. As to Whitlock, Danforth testified to both the May 25, 2017, and the June 14, 2017, statements. On May 25, 2017, Whitlock denied being present during the shooting, though she admitted to being in a fight near Sablewood apartments earlier in the day. Danforth first mentioned defendant's and Hart's names, not Whitlock. Whitlock denied knowing defendant and Hart. However, Danforth did not accept her denials. Danforth believed Whitlock was in a dating relationship with Hart. On June 14, 2017, Whitlock was in custody on a juvenile matter (due to her fight with McCaleb). During that interview, Whitlock identified defendant and Hart as the shooters. Whitlock was presented with a photo lineup that was compiled and administered by a different officer, who was not part of the investigation and did not know which photos depicted the suspects in the case. As to Arrington, Danforth testified that he administered the photo line up, even though he was familiar with the

investigation and the suspects. This was less than ideal, but, at the time, there was no one independent of the investigation to administer the line up.

¶ 57    The jury found defendant guilty of first-degree murder in that he committed an act which he knew created a great probability of death or bodily harm. 720 ILCS 5/9-1 (a)(2) (West 2016). It also found defendant guilty of first-degree murder under a felony murder theory in that he committed a forcible felony (aggravated discharge of a firearm) and during the commission of the felony, Sanders was killed. 720 ILCS 5/9-1(a)(3) (West 2016). Further, the jury found that the State proved the following two allegations: defendant personally discharged *a* firearm during the commission of the offense *and* defendant personally discharged *the* firearm that proximately caused Sanders's death. The trial court sentenced defendant to 40 years, plus a 25-year firearm enhancement based the jury's finding that defendant personally discharged the firearm that proximately caused Sanders's death, for a total of 65 years of imprisonment. Defendant filed an unsuccessful post-trial motion, and this appeal followed.

¶ 58                                    II. ANALYSIS

¶ 59    On appeal, defendant argues that: (1) the trial court erred in denying his motion to dismiss the grand jury's indictment; (2) the evidence was not sufficient to convict for first-degree murder; and (3) even if the evidence was sufficient to convict for first-degree murder, it was at best sufficient to establish that defendant, as one of two shooters firing toward the victim, personally discharged a firearm (730 ILCS 5/5-8-1(a)(1)(d)(ii) (West Supp. 2017) (20-year enhancement)), not that he personally discharged a firearm that proximately caused the victim's death (730 ILCS 5/5-8-1(a)(1)(d)(iii) (West Supp. 2017) (25-year enhancement)).

¶ 60                                    A. Indictment

¶ 61    Defendant argues that the trial court erred in denying his motion to dismiss the grand jury's indictment. We begin with a general overview of grand jury proceedings. The role of the State's Attorney's office in grand jury proceedings is to inform the grand jury of the proposed criminal charges and the applicable law. *People v. DiVincenzo*, 183 Ill. 2d 239, 254 (1998), *abrogated on other grounds by People v. McDonald*, 2016 IL 118882 (grand jury analysis continually endorsed by Illinois courts, particularly *People v. Wright*, 2017 IL 119561, ¶ 61). The role of the grand jury, in turn, is to determine whether probable cause exists that the person who is the subject of the proceedings has committed a crime, thus warranting a trial. *Id*. The grand jury does not finally adjudicate guilt or innocence. *People v. J.H.*, 136 Ill. 2d 1, 10 (1990). As such, grand jury proceedings are not mini-trials and the State is not bound by technical evidentiary rules and procedures applicable in a criminal trial. *Id.*; *People v. Creque*, 72 Ill. 2d 515, 527-28 (1978). For instance, the State has no duty to disclose exculpatory evidence during grand jury proceedings. *Torres*, 245 Ill. App. 3d at 301. " '[R]equiring the [State] to present exculpatory as well as inculpatory evidence would alter the grand jury's historical role, transforming it from an accusatory to an adjudicatory body.' " *Id*. (quoting *United States v. Williams*, 504 U.S. 36, 50 (1992)).

¶ 62    A defendant's ability to challenge a grand jury indictment is limited. See *DiVincenzo*, 183 Ill. 2d at 255. For example, a defendant may not challenge the sufficiency of the evidence considered by a grand jury, so long as some evidence was presented. *Id*. An indictment returned by a legally constituted grand jury is presumed valid (*id*.), and a defendant may seek the dismissal of the indictment only when: (1) the dismissal is authorized under section 114-1(a) of the Code (725 ILCS 5/114-1(a) (West 2018) (dismissal warranted when, *inter alia*, defendant has received immunity for the defense charged, the trial court does not have jurisdiction, the charge does not

state an offense, or the grand jury was improperly selected or acted in violation of article 112 of the Code)); or (2) there is a clear denial of due process. *People v. Stapinski*, 2015 IL 118278, ¶ 33.

¶ 63    Here, defendant alleges that there has been a clear denial of due process. "The due process rights of a defendant may be violated if the prosecutor deliberately and intentionally misleads the grand jury, uses known perjured or false testimony, or presents other deceptive or inaccurate evidence." *DiVincenzo*, 183 Ill. 2d at 257. However, the court should exercise great restraint in exercising its power to dismiss an indictment based on an allegation that the defendant's due process rights were violated, and it should only do so when a violation is clear and can be ascertained with certainty. *Torres*, 245 Ill. App. 3d at 300. Even when the violation is clear, the defendant still must establish actual and substantial prejudice. *Id.* The burden of proving actual and substantial prejudice rests with the defendant. *Id.* Prejudice is actual and substantial "only if without [the alleged misconduct] the grand jury would not have indicted the defendant." *Oliver*, 368 Ill. App. 3d at 697. The court must balance the gravity of the due process violation against the strength of the evidence supporting the finding of probable cause. *Id.* "If the evidence was strong enough that the grand jury would have indicted the defendant despite the [State's] misconduct, the misconduct was not prejudicial. However, if the evidence was so weak that the misconduct induced the grand jury to indict, prejudice is shown." *Id.* The mere possibility that an indictment might have been avoided but for the alleged misconduct is not enough to show actual and substantial prejudice. *Torres*, 245 Ill. App. 3d at 301.

¶ 64    When the facts are not in dispute, we review *de novo* whether the defendant suffered a prejudicial denial of due process. *Stapinski*, 2015 IL 118278, ¶ 35. "However, once [that is determined], the trial court's decision on the appropriate remedy—whether it be dismissal of the indictment or some other remedy—is reviewed for an abuse of discretion." *Id.* Further, while a

prejudicial violation of due process need not be intentional to warrant dismissal, *Oliver*, 368 Ill. App. 3d at 696, a determination that State acted intentionally in presenting false or misleading evidence can inform the trial court's decision as to whether the dismissal will be with prejudice or whether the State may seek to reindict a defendant. See *People v. Hunter*, 298 Ill. App. 3d 126, 131-32 (1998). Where the State willfully brings perjured testimony before the grand jury, the court is well within its discretion to dismiss the criminal charge against a defendant and prohibit the State from reindicting him. *Id.* Dismissing an indictment with prejudice is an extreme sanction. *People v. Mattis*, 367 Ill. App. 3d 432, 436 (2006). In this case, the trial court indicated that, even if it had chosen to dismiss the indictment, it would have been with leave to seek reindictment.

¶ 65        Here, the parties dispute whether the State's presentation of the evidence at the grand jury proceedings amounted to the mere failure to present exculpatory evidence, as in *Torres*, or whether the State misled the jury to a degree which would warrant the dismissal of the indictment, as in *Oliver*.

¶ 66        In *Torres*, a possession-with-intent-to-deliver case, the State had presented the grand jury with evidence that defendant was apprehended while a passenger in a vehicle containing weapons and eight grams of cocaine. See *Torres*, 245 Ill. App. 3d at 299, 301-02.[2] However, the State did not inform the grand jury that the driver of the vehicle told police that he had just picked up

---

[2]The *Torres* court did not expressly provide which inculpatory evidence the State presented at the grand jury proceedings. Instead, we infer which inculpatory evidence the State presented based on the court's summation of the alleged crime and the defendant's complaints as to which information was omitted.

defendant minutes before being apprehended and defendant was not aware of the contraband. *Id.* at 299.

¶ 67    The defendant moved to dismiss the indictment, arguing that the State was required to present the driver's exculpating statements to the grand jury. *Id*. at 299. The trial court agreed, dismissing the indictment, but the appellate court reversed. *Id.* at 299, 301. The appellate court determined that the State had not committed a due process violation. *Id.* at 301. It explained that the State has no duty to present exculpatory evidence to the grand jury. *Id.* at 301. Such a requirement would frustrate the grand jury's "critical purpose of *promptly* determining probable cause." (Emphasis in original.) *Id.* at 302. For example, were the State required to present the grand jury with exculpatory evidence, it might, as a practical matter, be compelled to gather additional inculpatory evidence to secure an indictment. *Id.* at 301. Such a cycle would transform the grand jury proceedings into the sort of mini-trial cautioned against by the supreme court in *Creque* (72 Ill. 2d at 527-28). *Id.* at 302.

¶ 68    In addition, the appellate court determined that the defendant could not establish prejudice. It explained that the driver's exculpatory statements

> "were not evidence of such a degree or character as would have absolutely prevented defendant's indictment. The fact that the grand jury *might* have chosen not to indict defendant if [the driver's] statements had been presented is not enough. Defendant does not satisfy his burden to establish clearly actual and substantial prejudice merely by demonstrating the possibility of avoiding indictment." (Emphasis in original and internal quotation marks omitted.) *Id.* at 301.

¶ 69    In *Oliver*, also a possession-with-intent-to-deliver case, the testifying police officer informed the grand jury that he had *personally witnessed* the defendant perform a hand-to-hand

transaction involving what was believed to be cocaine. *Id.* at 691-93. The defendant moved to dismiss the indictment, arguing that the State presented false and misleading evidence to the jury. *Id*. at 694. The testifying officer did not personally witness the hand-to-hand transaction. *Id*. Moreover, the officer who had actually witnessed the transaction did not see what was passed between defendant and the other men. *Id*. The trial court granted the motion to dismiss the indictment, and the appellate court affirmed. *Id*. at 694, 700. The appellate court explained:

> "Here, if the only defect in [the officer's grand jury] testimony were that its hearsay nature was concealed, we would be hard-pressed to determine that, had the grand juries known that the testimony was hearsay, they would not have indicted defendant. However, *** [the officer's] testimony was doubly deceptive. Not only was its hearsay nature concealed, but it also mischaracterized the observations of the actual eyewitness *so as to establish probable cause where none existed*. It is on this point that prejudice arises." (Emphasis added.) *Id.* at 697.

¶ 70 With *Torres* and *Oliver* in mind, we turn to the facts of the instant case. As noted by the trial court, unlike *Torres*, this case does not involve a pure question of the State's failure to disclose exculpatory information—Whitlock's May 25, 2017, statement. The June 14, 2017, statement is also at issue. With its affirmative decision to introduce Whitlock's June 14, 2017, statement but not the May 25, 2017, statement, the State arguably implied that Whitlock consistently implicated defendant and Hart when she did not. Still, unlike in *Oliver*, the State did not present false evidence. Whitlock *did* make a statement on June 14, 2017, that was consistent with her grand jury testimony. As such, we agree with the trial court that the circumstances of the instant case are more like *Torres* than *Oliver*. Like the trial court, this court has viewed the video recording of

both statements and we determine that defendant has not demonstrated that a clear and certain violation of his due process rights has occurred.

¶ 71    Moreover, assuming for the sake of analysis that defendant had established a clear and certain violation of his due process rights, he certainly cannot be said to have demonstrated actual and substantial prejudice. There are two ways that the State might have avoided implying that Whitlock consistently implicated defendant and Hart. First, it might have chosen not to disclose either prior statement. Second, it might have chosen to disclose both statements. Defendant cannot establish actual and substantial prejudice due to the State's failure to take either of these two avenues. As to the first approach, if the State had chosen not to disclose either statement, the State would still be left with Whitlock's grand jury testimony. This testimony, by itself, was enough to establish probable cause. Whitlock testified before the grand jury that she saw defendant fire a gun in the direction of the victim. This is not a case, like *Oliver*, where the alleged misleading evidence "established probable cause where none existed." *Oliver*, 368 Ill. App. 3d at 697.

¶ 72    As to the second approach, if the State had chosen to introduce both statements, the State also would have been able to question Whitlock as to why she did not implicate defendant and Hart in her first statement. Whitlock would have been able to answer, *as she did indeed testify before the grand jury*, that defendant told her that, if she implicated him, he would kill her. Whitlock received this threat shortly after witnessing defendant indiscriminately fire his gun toward a crowd of people. A reasonable grand jury could believe that Whitlock was still acting under the influence of defendant's threat just one day later when she made her initial statement denying that she knew the shooters. To be sure, any time the State takes a different approach in presenting the evidence there is a *chance* for a different result. Again, however, the mere possibility that an indictment might have been avoided had the State presented the evidence at

issue is not enough to warrant the dismissal of the indictment, *Torres*, 245 Ill. App. 3d at 301. For the reasons stated, the evidence at issue here, the May 25, 2017, statement, is not so clear cut as defendant would have us believe, and defendant cannot show more than a mere possibility he might have avoided indictment had the State introduced the May 25, 2017, statement.

¶ 73                                    B. Sufficiency

¶ 74    Defendant argues that the evidence was not sufficient to convict him of first-degree murder. Section 9-1 of the Criminal Code of 2012 provides:

> "A person who kills an individual without lawful justification commits first degree murder if, in performing the acts which cause the death: (1) he or she either intends to kill or do great bodily harm to that individual or another, or knows that such acts will cause death to that individual or another; or (2) he or she knows that such acts create a strong probability of death or great bodily harm to that individual or another; or (3) he or she, acting alone or with one or more participants, commits or attempts to commit a forcible felony other than second degree murder, and in the course of or in furtherance of such crime or flight therefrom, he or she or another participant causes the death of a person."
>
> 720 ILCS 5/9-1(a)(1), (2), (3) (West 2016).

Here, the jury found defendant guilty pursuant to sections 9-1(a)(2), (3). The State pursued multiple theories at trial, including both that defendant was the principal shooter and that he was accountable for Hart's actions. The alleged factual premise supporting each of these theories was that defendant and Hart perceived Sanders as being confrontational when Sanders yelled at the neighbor child to get into his apartment. This is when, according to Whitlock, the word "what" was shouted, and, according to Christine, Sanders explained that he was only talking to the child. Shots from the SUV then followed.

¶ 75    In reviewing a challenge to the sufficiency of the evidence, the question is whether, viewing the evidence in a light favorable to the prosecution, any rational trier of fact could have found the essential elements of the offense beyond a reasonable doubt. *People v. Collins*, 214 Ill. 2d 206, 217 (2005). We will reverse a criminal conviction only where the evidence is so improbable or unsatisfactory that it creates a reasonable doubt of the defendant's guilt. *Id.*

¶ 76    While true that the testimony of an accomplice must be scrutinized because of the motivation to shift blame to others (*People v. James*, 118 Ill. 2d 214, 224 (1987)), it is not our role to retry the defendant or substitute our judgment for that of the trier of fact. *Collins*, 214 Ill. 2d at 217. Rather, we defer to the trier of fact on matters of witness credibility and the weight to be afforded to the evidence. *People v. Ross*, 229 Ill. 2d 255, 272 (2008). It is the trier of fact's responsibility to resolve conflicts in the testimony and to draw reasonable inferences from the evidence. *People v. Phelps*, 211 Ill. 2d 1, 7 (2004).

¶ 77    Defendant contends that "no credible evidence was presented that [defendant] fired a gun or had knowledge that Hart planned to open fire while [defendant] drove away." Defendant appears to concede that, if the evidence was sufficient to establish either of these two scenarios, the evidence was sufficient to sustain his conviction for first degree murder. Defendant argues, however, that the State's case rests entirely on Whitlock's testimony, and Whitlock was not a credible witness. Defendant asserts that Whitlock's testimony was not credible, because: (1) in her initial, May 25, 2017, statement to police, Whitlock denied knowing who defendant was; (2) in her second, June 14, 2017, statement to police, she was high on marijuana; and (3) as a possible accomplice, she had an incentive to shift blame away from herself and to defendant and Hart.

¶ 78    We determine that the State presented sufficient evidence to show that defendant fired a gun. As such, we need not entertain the alternate theory of whether, if defendant did not fire a

gun, he had knowledge that Hart planned to open fire as he drove away. We first address Whitlock's testimony. Whitlock testified that she was in the car when defendant fired a gun out of the driver's side window. To be sure, Whitlock made a prior inconsistent statement, was under the influence of marijuana during her second statement to police, and may have had a motive to shift blame. However, it was for the jury to assess Whitlock's credibility. See *Ross*, 229 Ill. 2d at 272. The jury was aware of Whitlock's prior inconsistent statement—but it also heard evidence that Whitlock made that statement less than 24 hours after defendant, who remained at large, had threatened to kill her if she implicated him. The jury was made aware that Whitlock was under the influence of marijuana at the time she made her second statement—but it also heard Whitlock testify at trial that she was not currently under the influence. The jury viewed the video recording of Whitlock's second statement, and it may have reasonably concluded that Whitlock was not so addled that she was unable to provide a reliable account of the shooting. Finally, the jury was aware that Whitlock had participated in a fist fight that was the likely motivation for the group's return to the apartment complex and confrontational behavior—but it also was made aware that the State did not promise Whitlock anything before she implicated defendant and Hart. It was for the jury to assess Whitlock's testimony and weigh it against her prior statements and the possible motive for her testimony. To the extent the jury credited Whitlock's trial testimony, we cannot say it was so improbable or unsatisfactory that doing so created a reasonable doubt of the defendant's guilt.

¶ 79    Indeed, other evidence corroborated Whitlock's account of the shooting. Whitlock testified that two people fired guns, and the police found casings from two types of guns. Whitlock testified that defendant shot out the driver's window and Hart shot over the roof of the SUV from the passenger side while she remained huddled in the back seat. The security video confirms that shots

were fired from a dark SUV, although it does not clearly depict the color. Arrington identified defendant as the driver of the SUV from which shots were fired. The security video footage showed a shooter firing from the driver's seat, and, from her vantage point, Arrington saw Hart fire over the roof of the SUV. Whitlock testified that defendant drove north on Sablewood and then left on Halsted. The security video footage showed the SUV moving in the same direction.

¶ 80    Further, the State presented additional, compelling evidence. For example, Sago testified that defendant had possession of her green SUV at the time of the shooting. When investigators impounded and processed Sago's SUV, they found utility bills addressed to defendant inside. Investigator Voyles found a spent, 40-caliber shell casing, the same type found at the scene of the shooting, stuck to the rubber molding above the front passenger door of Sago's SUV. Finally, in Sago's initial statement to police, she stated that defendant told her that he was with Hart when Hart shot Sanders. In total, this evidence was sufficient to convict defendant of first-degree murder.

¶ 81                                C. Sentence

¶ 82    Finally, defendant argues that, even if the State proved that he personally discharged a firearm during the commission of the offense, it did not prove that defendant personally discharged the firearm that proximately caused Sanders's death. Under section 5-8-1(a)(1)(d)(ii), a defendant who discharges a firearm during the commission of a first-degree murder is subject to a 20-year sentencing enhancement. 730 ILCS 5/5-8-1(a)(1)(d)(ii) (West Supp. 2017). Under section 5-8-1(a)(1)(d)(iii), a defendant who discharges a firearm that proximately causes the death of a person during the commission of a first-degree murder is subject to a 25-year sentencing enhancement. 730 ILCS 5/5-8-1(a)(1)(d)(iii) (West Supp. 2017). Defendant requests that we vacate the 25-year firearm enhancement and impose a 20-year firearm enhancement.

¶ 83    The State concedes that it did not prove that defendant's gunshot proximately caused Sanders's death. Sanders sustained a single, fatal gunshot wound. Two types of casings were recovered from the scene, 40-caliber casings and 9-mm casings. A 40-caliber casing was found stuck to the molding near the passenger window, indicating that Hart had fired the 40-caliber bullets and defendant had fired the 9-mm bullets. However, Peters, the forensic pathologist, testified that he was unable to determine the caliber of the bullet that he recovered from Sanders's body.

¶ 84    As such, pursuant to Illinois Supreme Court Rule 615(b)(4) (eff. Jan. 1, 1967), we vacate the 25-year firearm sentencing enhancement and impose a 20-year firearm enhancement, for a total of 60 years' imprisonment.

¶ 85                                III. CONCLUSION

¶ 86    For the reasons stated, we affirm defendant's conviction and 40-year sentence. However, we vacate the 25-year firearm sentencing enhancement and impose a 20-year firearm enhancement, for a total of 60 years' imprisonment.

¶ 87    Conviction affirmed. Sentence affirmed as modified.