2022 IL App (2d) 200702-U
No. 2-20-0702
Order filed July 18, 2022

**NOTICE:** This order was filed under Supreme Court Rule 23(b) and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

_____

IN THE

APPELLATE COURT OF ILLINOIS

SECOND DISTRICT
_____

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) ) ) | Appeal from the Circuit Court of Winnebago County. |
| Plaintiff-Appellee, | ) ) | |
| v. | ) ) | Nos. 17-CF-1699 |
| | ) ) | |
| DEON LARAY HART, | ) ) | Honorable Brendan A. Maher, |
| Defendant-Appellant. | ) | Judge, Presiding. |

_____

JUSTICE BRENNAN delivered the judgment of the court.
Justices Jorgensen and Schostok concurred in the judgment.

**ORDER**

¶ 1    *Held*:  The trial court did not err in denying defendant's pre-trial motion to dismiss the indictment for first-degree murder. The trial court did not abuse its discretion in sentencing defendant to 40 years' imprisonment, plus a firearm sentencing enhancement, even though codefendant, who was five years older than defendant and had a lengthier criminal history, received the same sentence. However, as the State concedes, defendant is subject to a 20-year, not a 25-year, firearm sentencing enhancement. Conviction affirmed. Sentence affirmed as modified.

¶ 2    Defendant, Deon Laray Hart, filed a pre-trial motion pursuant to section 114-1(a) of the

Code of Criminal Procedure of 1963 (Code) (725 ILCS 5/114-1(a) (West 2018)) to dismiss the 19-

count bill of indictment, which included 16 counts for first-degree murder. Codefendant, Van

Douglas Richardson, Jr., filed a similar motion. Both defendants argued that the State misled the grand jury when it presented the testimony of an eye-witness, Marshayla Whitlock, and elicited that she had provided the police with a prior consistent statement but did not disclose that she had also provided the police with a prior inconsistent statement. The trial court denied both motions in a single ruling. A jury subsequently convicted defendant of first-degree murder. 720 ILCS 5/9-1 (a)(1), (a)(2), (a)(3) (West 2016). It also determined that defendant personally discharged the firearm that proximately caused the victim's death, making defendant subject to a 25-year sentencing enhancement. 730 ILCS 5/5-8-1(a)(1)(d)(iii) (West Supp. 2017). The trial court sentenced defendant to 40 years' imprisonment, plus the 25-year sentencing enhancement, for a total of 65 years' imprisonment.

¶ 3    On appeal, defendant argues that: (1) the trial court erred in denying his motion to dismiss the indictment[1]; (2) the trial court abused its discretion in sentencing defendant to the same term as codefendant, where codefendant was five years older and had a lengthier criminal history; and (3) even if the evidence was sufficient to convict for first-degree murder, as defendant concedes, it was not sufficient to establish that defendant, as one of two shooters firing toward the victim, personally discharged the firearm that proximately caused the victim's death (730 ILCS 5/5-8-1(a)(1)(d)(iii) (West Supp. 2017) (25-year enhancement)).

¶ 4    We reject defendant's first two arguments. The State concedes error as to the firearm

─────────────────────

[1]Codefendant Richardson has filed a similar appeal on this issue. See *People v. Richardson*, 2022 IL App (2d) 210231-U. The trial court adjudicated both motions in a single order. As such, both codefendants appeal from the same order, so there is great overlap in our analyses in the two appeals.

sentencing enhancement. Accordingly, we affirm defendant's conviction for first degree murder and 40-year sentence but vacate the 25-year enhancement and impose, instead, a 20-year enhancement, for a total of 60 years' imprisonment. Conviction affirmed. Sentence affirmed as modified.

¶ 5                                    I. BACKGROUND

¶ 6      Defendant does not dispute the sufficiency of the evidence on appeal. That evidence showed that, on May 24, 2017, Richardson and defendant fired gunshots from an SUV in the vicinity of an apartment complex on Sablewood Drive in Rockford. Many people were standing outside, and one person, Lester Sanders, was fatally shot by a single bullet. Sanders had heard a conflict outside and yelled to a neighbor child to get inside the apartment. Sanders's shouting drew the attention of Richardson and defendant, who fired shots in his direction. Sanders died after making it back inside his apartment, in front of his wife and children. Richardson, then age 27, drove the SUV from which the shots were fired, and both he and defendant, then age 22, fired shots from the vehicle while defendant's friend, Whitlock, then age 17, huddled in the backseat.

¶ 7                                    A. Pre-Trial

¶ 8                              1. Grand Jury Testimony

¶ 9      On June 21, 2017, and on August 2, 2017, the State conducted grand jury proceedings, calling Whitlock and Rockford police detective Joseph Danforth.

¶ 10     Whitlock acknowledged that she was presently in custody on a juvenile matter. She testified that she had not received an offer by the State in exchange for her cooperation. Turning to the shooting, Whitlock testified that Richardson drove defendant and herself to the Sablewood apartments, where defendant believed he had left his phone. There, Whitlock's friend, "Biff," expressed anger toward Whitlock's group, because they had caused a "commotion" earlier in the

day.

¶ 11    Whitlock's group returned to the vehicle, with Richardson driving, defendant in the front passenger seat, and Whitlock in the back seat. Whitlock observed that Richardson had a gun on his lap. She also observed that defendant had a gun.

¶ 12    As Whitlock's group began to drive away, someone outside the vehicle who Whitlock could not see yelled "what." Richardson and the person shouted back and forth. Richardson stuck his gun out of the window and started to shoot. Whitlock estimated that Richardson fired four shots as she screamed, "No, no, stop." Defendant told her to "shut the f*** up," and defendant then sat on the window frame and began to shoot over the roof of the vehicle. Whitlock estimated that defendant fired six shots. The men then continued to fire in all directions as Whitlock "balled up" in the backseat. She did not understand the men's motive: "I didn't want them to just do all this nonsense that they were doing for no reason." When the shooting ended, Whitlock remained in the vehicle for some time. Whitlock described her eventual departure:

> "We were still in the car, and I was stressing the fact that I wanted to get dropped off. And from there we dropped [defendant] off onto Green, and [Richardson] took me to Auburn Manor and told me that if I would say anything to the police that they would kill me and they would put a note by my body noting that they killed me because they were already going to jail for murder."

¶ 13    Whitlock also testified that, on June 14, 2017, she provided a video-recorded statement to police. The statement was, overall, consistent with the testimony she had just given. In the statement, Whitlock had told police that Richardson and defendant may have fired 30 to 50 shots, total, and that no one fired back at them. Also on June 14, 2017, Whitlock identified both Richardson and defendant from a photo lineup.

¶ 14    Danforth testified, *inter alia*, that, on May 24, 2017, he and other officers had responded to the scene of the crime. Among the witnesses to later provide written statements was Stacey McCaleb. McCaleb stated that, earlier on May 24, 2017, she had been in a fight with Whitlock at the Sablewood apartments (the "commotion" to which Biff would later refer). Then, later that day, she saw Whitlock return to the Sablewood apartments with two black males (who Danforth believed to be Richardson and defendant).

¶ 15    Danforth also testified that, on June 14, 2017, he interviewed Whitlock. Whitlock informed him that Richardson and defendant shot in the direction of the Sablewood apartments for no apparent reason. This occurred after an unknown person shouted "what" at Richardson and defendant. Whitlock was able to pick out Richardson and defendant from a photo lineup.

¶ 16    The grand jury returned a 19-count bill of indictment, which included 16 counts of first-degree murder. The counts alleged, variously, that defendant was the shooter that proximately caused the victim's death, that defendant fired a gun during the commission of the offense (but not necessarily that he fired the fatal shot), that defendant was accountable for the victim's murder, and that defendant participated in a forcible felony (aggravated discharge of a firearm) and the victim was killed in the course of that felony.

¶ 17                              2. Motion to Dismiss Indictment

¶ 18    On June 14, 2018, defendant moved to dismiss the indictment pursuant to section 114-1(a) of the Code. 725 ILCS 5/114-1(a) (West 2018). He argued that the State violated his due process rights by misleading the jury. Specifically, defendant argued that the State misled the jury when it elicited that, on June 14, 2017, Whitlock gave a statement to police that was consistent with her grand jury testimony, in that she implicated Richardson and defendant, but failed to disclose that, on May 25, 2017, Whitlock gave a statement to police that was inconsistent with her grand jury

testimony, in that she stated that she did not know the shooters.

¶ 19    Richardson filed a similar motion to dismiss the indictment. However, Richardson did not mention Danforth's testimony. The State filed substantively identical responses to Richardson's and defendant's motions to dismiss, and the trial court heard the motions at a joint hearing.

¶ 20    During the hearing, both defendants contended that *People v. Oliver*, 368 Ill. App. 3d 690, 697 (2006), controlled. The State, in turn, urged that *People v. Torres*, 245 Ill. App. 3d 297, 300 (1993), was more on-point. The trial court recognized that, per *Oliver*, the State was not permitted to mislead a grand jury or allow a witness to testify falsely before a grand jury. The court further recognized that, per *Torres* and unlike at a trial where guilt beyond a reasonable doubt is at issue, the State was not required to present exculpatory evidence to the grand jury. The court acknowledged that, because the State referenced Whitlock's prior consistent statement but not her prior inconsistent statement, "it had some concerns." Still, the court had viewed the video recordings of both statements and it believed that what had occurred was more similar to a decision to withhold exculpatory evidence than to outright mislead a grand jury or allow a witness to testify falsely. As such, the court denied the motions to dismiss the indictments. The court further indicated that, even if it had granted the motions to dismiss, it would have been with leave to seek reindictment.

¶ 21                                    B. Trial

¶ 22    Following a trial, the jury found defendant guilty of first-degree murder in that he intended to kill or do great bodily harm, intended to commit acts knowing that there was a strong probability of death or great bodily harm, and committed these acts while committing the offense of aggravated discharge of a firearm. 720 ILCS 5/9-1 (a)(1), (a)(2), (a)(3) (West 2016). Further, the jury found that the State proved the following two allegations: defendant personally discharged *a*

firearm during the commission of the offense *and* defendant personally discharged *the* firearm that proximately caused Sanders's death. The trial court sentenced defendant to 40 years' imprisonment, plus a 25-year firearm enhancement based the jury's finding that defendant personally discharged the firearm that proximately caused Sanders's death, for a total of 65 years of imprisonment.

¶ 23                                C. Sentencing Hearing

¶ 24    On September 11, 2020, the trial court conducted defendant's sentencing hearing. Defendant made a statement in allocution, claiming that he was innocent. As to statutory factors in aggravation, the court cited the need to deter others from gun violence. It also stressed defendant's criminal history, referring to defendant's presentencing report. The presentencing report showed that defendant committed several offenses in Minnesota. Specifically, in June 2007, at age 12, defendant was adjudicated a delinquent minor in juvenile court for committing second-degree arson. Between 2008 and 2010, defendant violated probation six times. These violations included committing subsequent violations of the law, using illicit drugs, running away from home, and displaying assaultive behavior while in treatment. In January 2011, defendant was adjudicated a delinquent minor for committing disorderly conduct; he then violated probation twice. In May 2011, defendant was again adjudicated a delinquent minor for disorderly conduct and he again violated probation. In October 2011, defendant was adjudicated a delinquent minor for the felony offense of possession of a pistol/assault weapon. It appears from the report that, initially, his adult sentence was stayed ("9-12 months Redwing Academy, Adult sentence of 60 months Stayed"). However, when he again violated probation, he was sentenced to 60 months in the Minnesota Department of Corrections. In November 2012, in adult court, he was convicted of the felony offense of "felon convicted crime of violence—firearm violation." He was sentenced

to 60 months imprisonment, to be served concurrent with the previous felony weapons offense. In April 2016, he was released to parole in Minnesota, where his parole officer reported that he was "totally non-compliant." As a result, a warrant issued for his arrest in August 2016. Defendant was still under the terms of his Minnesota parole when he committed the instant murder in Illinois.

¶ 25 The trial court stated that, although defendant has had the opportunity to participate in the rehabilitation services provided by the juvenile justice system, he has made no progress. Like defendant's parole officer, the court characterized defendant as "totally non-compliant" with the terms of his parole. The court further commented that defendant continued to declare affiliation with a street gang, has never spent any time leading a law-abiding life, and did not have "the ability to comport himself in any way with any rules of anyone."

¶ 26 As to statutory factors in mitigation, the trial court acknowledged that the presentencing report indicated that defendant had mental health issues. (For example, as a teenager, defendant was thought to have Parent-Child Relational Problem, Conduct Disorder, Attention Deficit Hyperactivity Disorder, Adjustment Disorder with Mixed Disturbance of Emotions and Conduct, and Anti-Social Personality Disorder traits.) However, the sentencing report did not provide a current, specific diagnosis or treatment plan.

¶ 27 As to the nature and circumstances of the crime, the court commented that it was one of the most senseless murder cases over which it had ever presided. Defendant killed a man who was trying to protect his family and the children of the neighborhood merely because defendant perceived that he had been disrespected. After considering the factors in aggravation, the factors in mitigation, and the circumstances of the crime, the court sentenced defendant to 40 years' imprisonment, plus a 25-year firearm enhancement, for a total of 65 years' imprisonment.

¶ 28 Defendant filed an unsuccessful motion to reconsider sentence. In it, he acknowledged the

nature and circumstances of the offense but argued, *inter alia*, that the trial court afforded too much weight to his juvenile criminal history, not enough weight to his lack of substantial criminal history as an adult, not enough weight to his age and rehabilitative potential, and not enough weight to his mental health issues. In denying the motion, the court explained that it had already conducted a full sentencing hearing. In preparation for that hearing, it had read the full sentencing report, including the victim impact statements. It believed that it had afforded appropriate weight to the statutory factors in mitigation, including defendant's mental health.

¶ 29    On December 11, 2020, *after* defendant filed his notice of appeal, the trial court conducted codefendant Richardson's sentencing hearing. Like defendant, Richardson made a statement in allocution claiming that he was innocent. Richardson's attorney informed the court that, at the age of six, Richardson himself had lost his own mother and sole custodian to a fatal shooting. The trial court listened but, nevertheless, stressed the need to deter others from committing similar crimes. It also reviewed Richardson's criminal history. Richardson's presentencing report showed that, in April 2001, at age 11, Richardson was adjudicated a delinquent minor for criminal damage to property. In December 2005, he was adjudicated a delinquent minor for simple assault and sentenced to 18 hours of community service. In July 2006, he was cited for the traffic offense of being a pedestrian walking on the highway. In August 2006, he was adjudicated a delinquent minor for battery and sentenced, *inter alia*, to nine days in jail. In July 2008, his probation was terminated unsatisfactorily. In February 2008, in what appears to be his first offense as an adult, he was convicted of criminal trespass to a building and sentenced to supervision. In October 2008, he was convicted for a violation of the controlled substances act (Class 1 felony) and was sentenced, *inter alia*, to probation and 180 days in jail. In April 2010, he violated his probation, and he was later sentenced to six years in the Department of Corrections for the 2008 drug offense.

In November 2011, he was convicted of unlawful possession of a weapon by a felon and was sentenced to 7 years in the Department of Corrections. Upon release, he committed the instant murder in May 2017. In addition, the following charges remained pending: armed habitual criminal (in relation to the instant murder); fleeing with attempt to allude (in a separate May 2017, incident); possession with intent to deliver heroin and cocaine and operating an uninsured vehicle (in a June 2017 incident); and home invasion, domestic battery, and armed habitual criminal (in a June 2017 incident against his girlfriend).

¶ 30     The trial court sentenced Richardson to a sentence identical to defendant's: 40 years' imprisonment, plus a 25-year firearm enhancement, for a total of 65 years of imprisonment. The court explained:

"I'm attempting to treat comparably situated defendants similarly and [I] reread Mr. Hart's Presentence Investigation Report and the similarities between them are many. Mr. Hart, though much younger than Mr. Richardson, is another person with an almost unbroken juvenile history and almost unbroken adult history. So[,] their criminal sentences and their crimes attributed to them are certainly different in each case. But a similarity between the two is that neither one, neither Mr. Richardson, nor Mr. Hart, have ever not been accused of and/or convicted of crimes in their entire juvenile or adult lives."

Also:

"I think they are comparable defendants in the crime. I think they are comparable defendants on paper when it comes to the background and their criminal history. Certainly not identical [but] comparable. And I think that the same sentence imposed on Mr. Hart is the appropriate sentence to be fair between the codefendants to impose on Mr. Richardson."

¶ 31     Richardson unsuccessfully moved to reconsider the sentence, arguing in part that it was he

who should receive the lesser sentence. The trial court denied the motion, and it explained:

> "Both [Richardson and Hart] were involved in the conduct. Both of them went to trial on the conduct that resulted in the death of Lester Sanders. Both of them elected to go to trial. Both of them were convicted following a trial of effectively the same offense. And so keeping the codefendant's sentences in line with one another [it] certainly didn't need to be done necessarily with precision, exact same sentence, but I didn't find a lot of difference between Mr. Richardson and Mr. Hart in the content of their respective Presentence Investigation Reports. Every case is different. Every person is different. Every person's history is different. But at least in terms of the, the level of criminality attributed to each of the two defendant's was important consideration for the Court on sentencing. In the written motion there's simply an allegation that Mr. Richardson's criminal history is less than or different from Mr. Hart's. I rereviewed the PSIRs, I don't disagree that they're different. I think that's indisputable. It isn't necessarily, however, the sole and only consideration nor is it the only factor that the State argued in, in the sentencing hearing for Mr. Richard[son]."

Defendant relies on these comments by the trial court when challenging his own sentence in the instant appeal.[2]

---

[2]As defendant could not have raised a disparate sentencing argument in his own motion to reconsider sentence, we decline to apply the forfeiture doctrine. Also, this court may take judicial notice of the transcripts from Richardson's sentencing hearing. *In re McDonald*, 144 Ill. App. 3d 1082, 1084 (1986). In addition, on April 5, 2022, we granted defendant's motion to access the record in Richardson's appeal, including the impounded presentence report.

¶ 32                                    II. ANALYSIS

¶ 33    On appeal, defendant argues that: (1) the trial court erred in denying his motion to dismiss

the indictment; (2) the trial court abused its discretion when it issued defendant a sentence identical

to that of Richardson; and (3) even if the evidence was sufficient to convict for first-degree murder,

which defendant concedes, it was at best sufficient to establish that defendant, as one of two

shooters firing toward the victim, personally discharged a firearm (730 ILCS 5/5-8-1(a)(1)(d)(ii)

(West Supp. 2017) (20-year enhancement)), not that he personally discharged a firearm that

proximately caused the victim's death (730 ILCS 5/5-8-1(a)(1)(d)(iii) (West Supp. 2017) (25-year

enhancement)).

¶ 34                                    A. Indictment

¶ 35    Defendant argues that the trial court erred in denying his motion to dismiss the grand jury's

indictment. We begin with a general overview of grand jury proceedings. The role of the State's

Attorney's office in grand jury proceedings is to inform the grand jury of the proposed criminal

charges and the applicable law. *People v. DiVincenzo*, 183 Ill. 2d 239, 254 (1998), *abrogated on

other grounds by People v. McDonald*, 2016 IL 118882, (grand jury analysis continually endorsed

by Illinois courts, particularly *People v. Wright*, 2017 IL 119561, ¶ 61). The role of the grand jury,

in turn, is to determine whether probable cause exists that the person who is the subject of the

proceedings has committed a crime, thus warranting a trial. *Id*. The grand jury does not finally

adjudicate guilt or innocence. *People v. J.H.*, 136 Ill. 2d 1, 10 (1990). As such, grand jury

proceedings are not mini-trials, and the State is not bound by technical evidentiary rules and

procedures applicable in a criminal trial. *Id*.; *People v. Creque*, 72 Ill. 2d 515, 527-28 (1978). For

instance, the State has no duty to disclose exculpatory evidence during grand jury proceedings.

*Torres*, 245 Ill. App. 3d at 301. " '[R]equiring the [State] to present exculpatory as well as

inculpatory evidence would alter the grand jury's historical role, transforming it from an accusatory to an adjudicatory body.' " *Id.* (quoting *United States v. Williams*, 504 U.S. 36, 50 (1992)).

¶ 36 A defendant's ability to challenge a grand jury indictment is limited. See *DiVincenzo*, 183 Ill. 2d at 255. For example, a defendant may not challenge the sufficiency of the evidence considered by a grand jury, so long as some evidence was presented. *Id.* An indictment returned by a legally constituted grand jury is presumed valid (*id.*), and a defendant may seek the dismissal of the indictment only when: (1) the dismissal is authorized under section 114-1(a) of the Code (725 ILCS 5/114-1(a) (West 2018) (dismissal warranted when, *inter alia*, defendant has received immunity for the defense charged, the trial court does not have jurisdiction, the charge does not state an offense, or the grand jury was improperly selected or acted in violation of article 112 of this Code); or (2) there is a clear denial of due process. *People v. Stapinski*, 2015 IL 118278, ¶ 33.

¶ 37 Here, defendant alleges that there has been a clear denial of due process. "The due process rights of a defendant may be violated if the prosecutor deliberately and intentionally misleads the grand jury, uses known perjured or false testimony, or presents other deceptive or inaccurate evidence." *DiVincenzo*, 183 Ill. 2d at 257. However, the court should exercise great restraint in exercising its power to dismiss an indictment based on an allegation that the defendant's due process rights were violated, and it should only do so when a violation is clear and can be ascertained with certainty. *Torres*, 245 Ill. App. 3d at 300. Even when the violation is clear, the defendant still must establish actual and substantial prejudice. *Id.* The burden of proving actual and substantial prejudice rests with the defendant. *Id.* Prejudice is actual and substantial "only if without [the alleged misconduct] the grand jury would not have indicted the defendant." *Oliver*, 368 Ill. App. 3d at 697. The court must balance the gravity of the due process violation against

the strength of the evidence supporting the finding of probable cause. *Id.* "If the evidence was strong enough that the grand jury would have indicted the defendant despite the [State's] misconduct, the misconduct was not prejudicial. However, if the evidence was so weak that the misconduct induced the grand jury to indict, prejudice is shown." *Id.* The mere possibility that an indictment might have been avoided but for the alleged misconduct is not enough to show actual and substantial prejudice. *Torres*, 245 Ill. App. 3d at 301.

¶ 38    When the facts are not in dispute, we review *de novo* whether the defendant suffered a prejudicial denial of due process. *Stapinski*, 2015 IL 118278, ¶ 35. "However, once [that is determined], the trial court's decision on the appropriate remedy—whether it be dismissal of the indictment or some other remedy—is reviewed for an abuse of discretion." *Id.* Further, while a prejudicial violation of due process need not be intentional to warrant dismissal, *Oliver*, 368 Ill. App. 3d at 696, a determination that the State acted intentionally in presenting false or misleading evidence can inform the trial court's decision as to whether the dismissal will be with prejudice or whether the State may seek to reindict a defendant. See *People v. Hunter*, 298 Ill. App. 3d 126, 131-32 (1998). Where the State willfully brings perjured testimony before the grand jury, the court is well within its discretion to dismiss the criminal charge against a defendant and prohibit the State from reindicting him. *Id.* Dismissing an indictment with prejudice is an extreme sanction. *People v. Mattis*, 367 Ill. App. 3d 432, 436 (2006). In this case, the trial court indicated that, even if it had chosen to dismiss the indictment, it would have been with leave to seek reindictment.

¶ 39    Here, the parties dispute whether the State's presentation of the evidence at the grand jury proceedings amounted to the mere failure to present exculpatory evidence, as in *Torres*, or whether the State misled the jury to a degree which would warrant the dismissal of the indictment, as in *Oliver*.

¶ 40    In *Torres*, a possession-with-intent-to-deliver case, the State had presented the grand jury with evidence that defendant was apprehended while a passenger in a vehicle containing weapons and eight grams of cocaine.  See *Torres*, 245 Ill. App. at 299, 301-02.[3]  However, the State did not inform the grand jury that the driver of the vehicle told police that he had just picked up defendant minutes before being apprehended and defendant was not aware of the contraband.  *Id*. at 299.

¶ 41    The defendant moved to dismiss the indictment, arguing that the State was required to present the driver's exculpating statements to the grand jury.  *Id*. at 299.  The trial court agreed, dismissing the indictment, but the appellate court reversed.  *Id*. at 299, 301.  The appellate court determined that the State had not committed a due process violation.  *Id*. at 301.  It explained that the State has no duty to present exculpatory evidence to the grand jury.  *Id*. at 301.  Such a requirement would frustrate the grand jury's "critical purpose of *promptly* determining probable cause."  (Emphasis in original.)  *Id*. at 302.  For example, were the State required to present the grand jury with exculpatory evidence, it might, as a practical matter, be compelled to gather additional inculpatory evidence to secure an indictment.  *Id*. at 301.  Such a cycle would transform the grand jury proceedings into the sort of mini-trial cautioned against by the supreme court in *Creque* (72 Ill. 2d at 527-28).  *Id*. at 302.

¶ 42    In addition, the appellate court determined that the defendant could not establish prejudice. It explained that the driver's exculpatory statements

---

[3]The *Torres* court did not expressly provide which inculpatory evidence the State presented at the grand jury proceedings.  Instead, we infer which inculpatory evidence the State presented based on the court's summation of the alleged crime and the defendant's complaints as to which information was omitted.

"were not evidence of such a degree or character as would have absolutely prevented defendant's indictment. The fact that the grand jury *might* have chosen not to indict defendant if [the driver's] statements had been presented is not enough. Defendant does not satisfy his burden to establish clearly actual and substantial prejudice merely by demonstrating the possibility of avoiding indictment." (Emphasis in original and internal quotation marks omitted.) *Id.* at 301.

¶ 43 In *Oliver*, also a possession-with-intent-to-deliver case, the testifying police officer informed the grand jury that he had *personally witnessed* the defendant perform a hand-to-hand transaction involving what was believed to be cocaine. *Oliver*, 368 Ill. App. 3d at 691-93. The defendant moved to dismiss the indictment, arguing that the State presented false and misleading evidence to the jury. *Id.* at 694. The testifying officer did not personally witness the hand-to-hand transaction. *Id.* Moreover, the officer who had actually witnessed the transaction did not see what was passed between defendant and the other men. *Id.* The trial court granted the motion to dismiss the indictment, and the appellate court affirmed. *Id.* at 694, 700. The appellate court explained:

"Here, if the only defect in [the officer's grand jury] testimony were that its hearsay nature was concealed, we would be hard-pressed to determine that, had the grand juries known that the testimony was hearsay, they would not have indicted defendant. However, *** [the officer's] testimony was doubly deceptive. Not only was its hearsay nature concealed, but it also mischaracterized the observations of the actual eyewitness *so as to establish probable cause where none existed*. It is on this point that prejudice arises." (Emphasis added.) *Id.* at 697.

¶ 44 With *Torres* and *Oliver* in mind, we turn to the facts of the instant case. As noted by the trial court, unlike *Torres*, this case does not involve a pure question of the State's failure to disclose

exculpatory information—Whitlock's May 25, 2017, statement. The June 14, 2017, statement is also at issue. With its affirmative decision to introduce Whitlock's June 14, 2017, statement but not the May 25, 2017, statement, the State arguably implied that Whitlock consistently implicated defendant and Richardson when she did not. Still, unlike in *Oliver*, the State did not present false evidence. Whitlock *did* make a statement on June 14, 2017, that was consistent with her grand jury testimony. As such, we agree with the trial court that the circumstances of the instant case are more like *Torres* than *Oliver*. Like the trial court, this court has viewed the video recording of both statements and we determine that defendant has not demonstrated that a clear and certain violation of his due process rights has occurred.

¶ 45    Moreover, assuming for the sake of analysis that defendant had established a clear and certain violation of his due process rights, he certainly cannot be said to have demonstrated actual and substantial prejudice. There are two ways that the State might have avoided implying that Whitlock consistently implicated defendant and Richardson. First, it might have chosen not to disclose either prior statement. Second, it might have chosen to disclose both statements. Defendant cannot establish actual and substantial prejudice due to the State's failure to take either of these two avenues. As to the first approach, if the State had chosen not to disclose either statement, the State would still be left with Whitlock's grand jury testimony. This testimony, by itself, was enough to establish probable cause. Whitlock testified before the grand jury that she saw defendant fire a gun over the roof of the SUV in the direction of the victim. This is not a case, like *Oliver*, where the alleged misleading evidence "established probable cause where none existed." *Oliver*, 368 Ill. App. 3d at 697.

¶ 46    As to the second approach, if the State had chosen to introduce both statements, the State also would have been able to question Whitlock as to why she did not implicate defendant and

Richardson in her first statement. Whitlock would have been able to answer, *as she did indeed testify before the grand jury*, that Richardson told her that, if she implicated him, he would kill her. Whitlock received this threat shortly after witnessing defendant and Richardson indiscriminately fire their guns toward a crowd of people. A reasonable grand jury could believe that Whitlock was still acting under the influence Richardson's threat just one day later when she made her initial statement denying that she knew the shooters. Additionally, the State would have been able to note that McCaleb told Danforth that she saw Whitlock return to the scene with two males, which was contrary to Whitlock's first statement. To be sure, any time the State takes a different approach in presenting the evidence there is a *chance* for a different result. Again, however, the mere possibility that an indictment might have been avoided had the State presented the evidence at issue is not enough to warrant the dismissal of the indictment, *Torres*, 245 Ill. App. 3d at 301. For the reasons stated, the evidence at issue here, the May 25, 2017, statement, is not so clear cut as defendant would have us believe, and defendant cannot show more than a mere possibility he might have avoided indictment had the State introduced the May 25, 2017, statement.

¶ 47                                      B. Disparate Sentence

¶ 48     Next, defendant raises a disparate sentencing argument. An improper disparate sentence may occur either when similarly situated defendants receive disparate sentences or dissimilarly situated defendants receive the same sentence. See *People v. Thompson*, 2020 IL App (1st) 171265, ¶ 109. Here, defendant points to the trial court's comments at Richardson's sentencing hearing and argues that he is not similarly situated to Richardson and, therefore, should not have received the same sentence. Defendant concedes that he and Richardson were equally culpable in the instant murder. However, he contends that he has greater rehabilitative potential, given his younger age, 22 as compared to 27, and lesser criminal history. Defendant notes that, aside from

the instant murder, Richardson has been convicted of three offenses as an adult and has several pending charges, whereas defendant has been convicted of just one offense as an adult (although he served time in the Minnesota Department of Corrections following the revocation of probation for a second weapons offense).

¶ 49     The trial court has great discretion in sentencing a defendant, so long as it imposes a sentence within the statutory range. *People v. Calhoun*, 404 Ill. App. 3d 362, 385 (2010). We will not disturb a trial court's sentence unless it constitutes an abuse of discretion. *Id.* A trial court abuses its discretion when it imposes a sentence that is greatly at variance with the purpose and spirit of the law. *Id.* "In crafting a sentence, the trial court must balance the seriousness of the offense and the objective of restoring the offender to useful citizenship." (Internal quotation marks omitted.) *Thompson*, 2020 IL App (1st) 171265, ¶ 104. A defendant's potential for rehabilitation may be shown by his youth or by his lack of criminal history. See, *e.g.*, *People v. Babiarz*, 271 Ill. App. 3d 153, 164 (1995). While rehabilitation must be an objective in fashioning any sentence, *People v. Wendt*, 163 Ill. 2d 346, 353 (1994), the court, in its discretion, may choose to afford greater weight to the seriousness of the offense than to the defendant's rehabilitative potential. *Thompson*, 2020 IL App (1st) 171265, ¶ 104.

¶ 50     Consistent with these general principles in sentencing, fundamental fairness requires that similarly situated defendants may not receive grossly disparate sentences. *People v. Bares*, 97 Ill. App. 3d 728, 738 (1981). As a corollary, defendants who are not similarly situated should not receive the same sentence. *People v. Stambor*, 33 Ill. App. 3d 324, 326 (1975). Defendants may be similarly situated when their degree of participation in the crime is similar (*People v. Jackson*, 145 Ill. App. 3d 626, 646 (1986)), when their criminal backgrounds are similar (*id.*), or when their

level of maturity is similar (*People v. Dimmick*, 90 Ill. App. 3d 136, 139 (1980)). As stated by the *Stambor* court:

> "[T]here can be an abuse of discretion when two codefendants are given the same sentence, although having widely different criminal records and different roles in the particular crime, and where there is a difference in other pertinent factors which are commonly used to evaluate the proper punishment required." *Stambor*, 33 Ill. App. 3d at 326.

¶ 51 We find *Stambor* instructive. In *Stambor*, the defendant and the codefendant were convicted of burglary, and the trial court imposed identical sentences of not less than two nor more than six years of imprisonment. *Id.* at 325. The defendant argued that the trial court abused its discretion in imposing identical sentences, because, in his view, he had considerably greater rehabilitative potential than the codefendant. *Id.* The appellate court disagreed. *Id.* at 326. It acknowledged that identical sentences could be inappropriate when rehabilitative potential varied "widely," but such was not the case before it. *Id.* The defendant was 23 and the codefendant was 26. *Id.* The defendant had graduated high school and maintained employment, whereas the codefendant completed just two years of high school and was not employed due to an injury. *Id.* The defendant's criminal history consisted of one conviction for deceptive practices and "some other problems with the law," including a bond forfeiture. *Id.* The codefendant's criminal history consisted of one conviction for aggravated battery and three property offenses. *Id.* The appellate court explained that, while the codefendant's criminal history was indeed greater, it was not greater to such a degree as would render the trial court's decision to issue identical sentences unfair or an abuse of discretion. *Id.* at 327. Moreover, the appellate court continued, the trial court was free to afford greater weight to the nature and circumstances of the crime. *Id.* at 326-27. And, in that

regard, as the defendant was "at least an equal participant" in the burglary, the trial court was justified in imposing identical sentences. *Id.*; *cf. Jackson*, 145 Ill. App. 3d at 645-47 (the record did not support a disparity of 50 years between the sentences of the defendant and the codefendant where the defendant did not bear greater culpability for the offense).

¶ 52    Here, as in *Stambor*, the trial court was free to afford greater weight to the nature and circumstances of the crime than to defendant's rehabilitative potential.  Indeed, the trial court here stressed the severe nature and circumstances of the crime, calling it one of the most senseless murders over which it had ever presided.  The victim died in front of his wife and children while trying to protect them.  Defendant was not provoked, but merely perceived that he had been disrespected.  The court noted that defendant was an equal participant in the crime, and it stated that it wished to deter others from resorting to gun violence.  In contrast, the court did not believe defendant's rehabilitative potential to be great.  It stated that defendant had ample opportunity to participate in the rehabilitative services offered by the juvenile justice system, but he made no progress.  It also recounted that defendant was, over the years, "totally non-compliant" with the terms of his parole and he has never demonstrated "the ability to comport himself in any way with any rules of anyone."

¶ 53    Not only did the trial court give little weight to defendant's rehabilitative potential, but it also did not find a great difference between defendant's rehabilitative potential and Richardson's rehabilitative potential.  This, too, was reasonable.  We observe that *Richardson* was able to raise a non-frivolous argument at his motion-to-reconsider sentencing hearing that it was he who should receive the lesser sentence.  There were, in fact, certain aspects of Richard's profile that may have weighed in his favor: he denied affiliation with a street gang, he had a greater, though still limited, work history, and his mother suffered a violent death during his formative years.  In *defendant's*

favor, however, was that he was younger and had committed fewer offenses as an adult. The court recognized these differences. It noted, however, that "a similarity between the two is that neither one, neither Mr. Richardson, nor [defendant], have ever not been accused of and/or convicted of crimes in their entire juvenile or adult lives." The court reasonably found this similarity more compelling than the differences between defendant and Richardson. Indeed, defendant was on parole following two weapons offenses when he chose to fire his gun in the direction of Sanders. Defendant's criminal history involving weapons was highly relevant to his participation in the instant offense and, while Richardson may have had a greater number of adult convictions, Richardson's criminal history was not greater to such a degree as would render the trial court's decision to issue identical sentences unfair or an abuse of discretion. See *Stambor*, 33 Ill. App. 3d at 326.

¶ 54    The trial court demonstrated a proper understanding of the law when it acknowledged that the defendants' backgrounds were "certainly not identical [but] comparable" and, as such, aimed to "kee[p] the codefendant's sentences in line with one another." The court further recognized that, to do so, it did not need to render the "exact same sentence" to each defendant. Still, as discussed, the trial court acted within its discretion when it rendered identical sentences, because it reasonably afforded greater weight to the nature and circumstances of the offense, for which the codefendants were equally culpable, than to defendant's rehabilitative potential, which the trial court found to be minimal and not greatly different than Richardson's. As in *Stambor*, we acknowledge that identical sentences could be inappropriate when rehabilitative potential varies "widely," but such is not the case before us. See *Stambor*, 33 Ill. App. 3d at 326. The trial court did not abuse its discretion in sentencing defendant.

¶ 55                                C. Sentencing Enhancement

¶ 56　Finally, defendant argues that, even if the State proved that he personally discharged a firearm during the commission of the offense, it did not prove that defendant personally discharged the firearm that proximately caused Sanders's death. Under section 5-8-1(a)(1)(d)(ii), a defendant who discharges a firearm during the commission of a first-degree murder is subject to a 20-year sentencing enhancement. 730 ILCS 5/5-8-1(a)(1)(d)(ii) (West Supp. 2017). Under section 5-8-1(a)(1)(d)(iii), a defendant who discharges a firearm that proximately causes the death of a person during the commission of a first-degree murder is subject to a 25-year sentencing enhancement. 730 ILCS 5/5-8-1(a)(1)(d)(iii) (West Supp. 2017). Defendant requests that we vacate the 25-year firearm enhancement and impose a 20-year firearm enhancement.

¶ 57　The State concedes that it did not prove that defendant's gunshot proximately caused Sanders's death. Sanders sustained a single, fatal gunshot wound. However, the forensic pathologist testified that he was unable to determine from which type of gun the bullet came. As such, pursuant to Illinois Supreme Court Rule 615(b)(4) (eff. Jan. 1, 1967), we vacate the 25-year firearm enhancement and impose a 20-year firearm enhancement, for a total of 60 years' imprisonment.

¶ 58　　　　　　　　　　　　　III. CONCLUSION

¶ 59　For the reasons stated, we affirm defendant's conviction and 40-year sentence. However, we vacate the 25-year firearm enhancement and impose a 20-year firearm enhancement, for a total of 60 years' imprisonment.

¶ 60　Conviction affirmed. Sentence affirmed as modified.