# Illinois Official Reports

## Supreme Court

---

### *People v. Stapinski*, 2015 IL 118278

---

| | |
|---|---|
| Caption in Supreme Court: | THE PEOPLE OF THE STATE OF ILLINOIS, Appellee, v. ANTHONY M. STAPINSKI, Appellant. |
| Docket No. | 118278 |
| Filed | October 8, 2015 |
| Decision Under Review | Appeal from the Appellate Court for the Third District, heard in that court on appeal from the Circuit Court of Will County, the Hon. Amy Bertani-Tomczak, Judge, presiding. |
| Judgment | Appellate court judgment reversed. Circuit court judgment affirmed. Cause remanded. |
| Counsel on Appeal | Phyllis J. Perko, of Law Offices of Harlovic & Perko, of West Dundee, for appellant. |
| | Lisa Madigan, Attorney General, of Springfield, and James W. Glasgow, State's Attorney, of Ottawa (Carolyn E. Shapiro, Solicitor General, and Michael M. Glick and Matthew P. Becker, Assistant Attorneys General, of Chicago, of counsel), for the People. |
| Justices | JUSTICE BURKE delivered the judgment of the court, with opinion. Chief Justice Garman and Justices Freeman, Thomas, Kilbride, Karmeier, and Theis concurred in the judgment and opinion. |

¶ 1     On May 17, 2012, defendant, Anthony M. Stapinski, was indicted on a single count of unlawful possession of a controlled substance (ketamine) with intent to deliver. 720 ILCS 570/401(a)(10.5) (West 2010). Defendant filed a motion to dismiss the indictment, arguing that the indictment violated his due process rights and the executed cooperation agreement defendant had entered into with police. The State did not dispute the existence of the cooperation agreement, but argued that defendant did not fulfill his obligations under the agreement. The trial court of Will County ruled in defendant's favor and granted defendant's motion to dismiss the indictment. The appellate court reversed and remanded for further proceedings.

¶ 2     We granted defendant's petition for leave to appeal. Ill. S. Ct. R. 315 (eff. Jan. 1, 2015). For the reasons that follow, we reverse the judgment of the appellate court.

¶ 3                                    BACKGROUND

¶ 4     On February 13 and 14, 2013, a hearing was held on defendant's motion to dismiss. At that hearing, witness testimony established the following facts:

¶ 5     Romeoville, Illinois, police Sergeant Christine Masterson (Masterson) received information from Postal Inspector Gunther (Gunther) that the Naperville, Illinois, post office had in its possession a package from Pakistan which was addressed to defendant and believed to contain an illegal substance. A search warrant was obtained and the package was opened. The package contained a liquid which was suspected to be ketamine, although tests conducted by Masterson were unable to confirm that. The package was then resealed and released to the Naperville post office to be delivered to defendant.

¶ 6     On April 12, 2011, defendant drove to the Naperville post office to pick up the package. After defendant obtained the package, he was stopped outside the post office by Masterson and seven or eight armed officers from the Romeoville and Naperville police departments. Defendant was handcuffed and the package was taken from him.

¶ 7     Masterson then took defendant aside, removed his handcuffs, and told him he was not under arrest. She asked if he would be willing to accompany her to the police station to discuss the possibility of him cooperating with the police with regard to the package. Defendant agreed and was then taken to the Romeoville police station in a Naperville police squad car. Defendant's vehicle was impounded.

¶ 8     According to Masterson, at the station she asked defendant if he would be willing to assist the police in apprehending the person to whom defendant was to deliver the package of ketamine, as well as other drug investigations. Masterson testified that she explained to defendant what his cooperation would entail and suggested that it would be in defendant's best interests if he cooperated. Defendant indicated that he was interested, but that he wanted to speak with his attorney first. Defendant was never advised of his *Miranda* rights but was permitted to phone his attorney.

¶ 9     Defendant was also permitted to call his mother, Susan Pratl, who came to the Romeoville police station, where she met with Masterson, Gunther and defendant. Pratl testified that when she first arrived at the police station on April 12, 2011, she spoke to Masterson, who advised her that her son had been picked up because of a package that was addressed to him. Masterson

told Pratl that her son was not under arrest and they were more interested in apprehending whoever was the intended recipient of the package. Masterson also advised Pratl that her vehicle, which defendant was driving at the time of the incident, had been seized. However, Masterson told her that it would be in her son's best interests to cooperate with the police because, if he did, he would not be charged and Pratl's vehicle would be released.

¶ 10     Pratl then joined Masterson and Gunther in a meeting with her son. Pratl testified that she encouraged her son to cooperate with the police because Masterson had told her he would not be charged and her vehicle would be released.

¶ 11     Defendant testified that when he first spoke with Masterson at the Romeoville police station, she told him that he would not be charged and his mother's car would be returned if he helped them apprehend the person to whom he was to deliver the package. Defendant testified that Gunther and Masterson repeatedly advised him that cooperation was in his best interests and, if he cooperated, he would not be charged with the ketamine offense. According to defendant, neither Masterson nor Gunther ever stated that he would be required to assist in additional cases to avoid being charged in the ketamine matter. Rather, defendant testified that Masterson told him that if he was able to assist in other cases, she would make a college drug charge "go away."

¶ 12     Defendant testified that he spoke to his attorney by phone and called his mother, who then came to the station. After speaking with his mother and his attorney, defendant agreed to cooperate with the police. Defendant testified that he then told Masterson that the persons to whom he was to deliver the ketamine package were Taylor Malcolm (Malcolm) and John Dylan Blair (Blair).

¶ 13     Pratl testified that, as soon as her son mentioned one of the names, Gunther became very excited and stated that they had been trying to apprehend this person for some time. After this meeting, defendant was permitted to leave the station.

¶ 14     The next day, April 13, 2011, defendant's attorney, Frank DeSalvo, contacted Masterson. Arrangements were made for another meeting with defendant to take place at the Romeoville police station on April 14, 2011. On that day, Masterson, Gunther, Pratl, DeSalvo and defendant all met at the Romeoville police department. According to Masterson, at this meeting, she told defendant that if he cooperated with police, he would not be charged with possession of ketamine. However, Masterson also testified that she told defendant that his "cooperation" meant that he would have to assist the police in four cases in order to avoid the ketamine charge.

¶ 15     Pratl testified regarding this meeting, but her recollection of events was somewhat different. She said Gunther and Masterson reiterated that they wanted to work with defendant to apprehend Malcolm and Blair and that defendant would not be charged if he cooperated in their apprehension. According to Pratl, at no point during this meeting did Gunther or Masterson ever say that defendant needed to participate in four cases to avoid being charged with possession of ketamine.

¶ 16     DeSalvo testified that, before the meeting began, he first spoke with Masterson separately. She advised him that the focus was on arresting Malcolm because he was a major marijuana distributor in Will County and the surrounding counties. DeSalvo testified that Masterson repeated the terms of the agreement, *i.e.*, that if defendant cooperated in the arrest of Malcolm, he would not be charged with the ketamine offense. Based on these assurances from

Masterson, DeSalvo advised defendant to cooperate and participate in the planned controlled delivery of the package to Malcolm.

¶ 17    DeSalvo also testified that he was present when Masterson questioned defendant regarding other narcotics connections and sources he had. He confirmed that Masterson told defendant that if he agreed to cooperate in other cases, she would make his prior drug charge from college "go away." According to DeSalvo, during this meeting, no one ever mentioned a specific number of cases defendant was required to assist with.

¶ 18    Defendant testified that, at the April 14, 2011, meeting, he agreed to assist in the controlled delivery of the ketamine package to Malcolm and Blair. In addition, he agreed to work with the police as a confidential informant and also provided the police with names of other persons he knew to be involved in drug trafficking. According to defendant, he was told that his assistance in other drug cases would make an earlier college drug possession matter "go away."

¶ 19    After the meeting, defendant was introduced to Mimi Bejda (Bejda), a Romeoville police officer working with the Will County Cooperative Police Assistance Team, an undercover drug unit. Bejda explained to defendant what his role would be in the controlled delivery of the package to Malcolm. Defendant was given a transmitter for his ear and a recording device was taped to his shirt. Defendant then made several phone calls, which were intercepted and recorded by the police. In these calls, defendant made arrangements for delivering the package to Malcolm and Blair.

¶ 20    The next day, April 15, 2011, Bejda met with defendant at his mother's home. After receiving additional instructions from Bejda, defendant participated in the controlled delivery of the ketamine package, and as a result, the police arrested Malcolm and Blair, who were later successfully prosecuted for possession of ketamine.

¶ 21    DeSalvo testified that he called Masterson a few days after April 15, 2011, to confirm the arrest of Malcolm and Blair. According to DeSalvo, Masterson was "jubilant" and said "we had a very good day." At that point, DeSalvo believed the ketamine charges against defendant had been dropped, therefore, he asked how defendant could work off his college charge. DeSalvo testified that Masterson said defendant should continue to work with Bejda to eliminate that charge, but never specified how many cases defendant had to assist with.

¶ 22    Following the arrest of Malcolm and Blair, defendant continued to work with Bejda as a confidential informant. However, according to defendant, following Malcolm's and Blair's arrest, the word on the street was that he was a "snitch." As a result, Bejda stopped taking his calls and defendant was unable to secure any other arrests for the police.

¶ 23    Bejda testified that she told defendant that, if he cooperated with the police on three drug investigations of the same class or higher as the ketamine possession offense, she would inform the State's Attorney of his cooperation. Bejda said she never promised defendant that charges would not be filed in exchange for his cooperation. Bejda also testified that after defendant assisted in the arrest of Malcolm and Blair, sometime around May, he stopped returning her telephone calls. Then, in October 2011, defendant was informed that they were no longer willing to work with him as a confidential informant. After that, Bejda informed Masterson that defendant did not fulfill his obligation.

¶ 24    On March 20, 2012, Masterson filed a criminal complaint against defendant, charging him with the April 12, 2011, offense of unlawful possession of a controlled substance containing ketamine, with intent to deliver. 720 ILCS 570/401(a)(10.5) (West 2010). Masterson testified

that she filed the charge because Bejda informed her defendant did not assist in four cases, as they had agreed. On May 17, defendant was indicted for the offense.

¶ 25   Defendant filed a motion to dismiss the charge, arguing that the indictment violated his due process rights as well as the cooperation agreement he entered into with police. On February 27, 2013, after hearing all of the evidence, as set forth above, the circuit court granted defendant's motion to dismiss the indictment. The court noted that, of the five persons present at the April 14, 2011, meeting, four persons testified and three of them contradicted Masterson. The fifth person—the postal inspector—did not testify. The court concluded that Masterson and defendant had entered into a valid oral cooperation agreement and its terms were that, if defendant cooperated in the arrests of Malcolm and Blair, he would not be charged with the ketamine offense. The court further found that defendant's due process rights were violated because he incriminated himself based upon the promises that were made to him and that defendant fulfilled his part of the bargain. As a result, the court held that defendant could not be charged and dismissed the indictment.

¶ 26   The State filed a motion to reconsider in which it now challenged the validity of the cooperation agreement. The State contended that, because the State's Attorney never approved the cooperation agreement, the State was not bound by the agreement between Masterson and defendant. The State further argued that the trial court's reasoning for dismissing the indictment was faulty because defendant's due process rights were not violated. According to the State, any statements defendant made during "[p]lea [d]iscussions" were inadmissible under Illinois Supreme Court Rule 402(f) (eff. July 1, 2012), and therefore defendant's right against self-incrimination was not implicated.

¶ 27   Following a hearing, the circuit court denied the State's motion to reconsider and the State appealed. On appeal, the State argued that the trial court erred in dismissing the indictment because the correct remedy was suppression of defendant's incriminating statements. In a Rule 23 order, a divided appellate court panel reversed and remanded. 2014 IL App (3d) 130352-U.

¶ 28   Justice Schmidt, writing for the court, noted that the State was not contesting the trial court's finding that the government violated defendant's due process rights when it acquired incriminating statements from him based on promises not to prosecute. Rather, what the State argued was that dismissal was improper because defendant's due process rights could be protected by suppressing defendant's incriminating statements. Justice Schmidt then stated that, because the essential facts concerning defendant's cooperation with the police were undisputed, the question of whether defendant suffered a prejudicial denial of due process would be reviewed *de novo*.

¶ 29   Citing *People v. Lawson*, 67 Ill. 2d 449 (1977), Justice Schmidt then held that although a trial court has the ability to dismiss a criminal charge for a due process violation as part of the court's inherent authority to guarantee a defendant a fair trial, the circuit court erred in this case by dismissing the charge against defendant because defendant "cannot show that the surrender of his right against self-incrimination foreclosed the possibility of a fair trial." 2014 IL App (3d) 130352-U, ¶ 26. The matter was remanded to the circuit court with orders that it hold a hearing to determine what evidence should be excluded as a result of the police conduct in this case. Thereafter, it should be determined whether there was sufficient evidence remaining to allow the case to go forward.

¶ 30    Justice Wright specially concurred, finding that it was premature for the court "to imply defendant's incriminating statements are not admissible." *Id.* ¶ 35 (Wright, J., specially concurring). Justice Carter dissented, finding that the circuit court did not err in granting defendant's motion for dismissal. *Id.* ¶ 40 (Carter, J., dissenting). According to Justice Carter, because of the "due process ramifications of what occurred," the only appropriate remedy was dismissal of the indictment. *Id.* Only in this way would defendant receive the benefit of the bargain he made with the police; mere suppression would not remove the prejudice defendant had suffered.

¶ 31                              ANALYSIS
¶ 32                          Standard of Review
¶ 33    We first address the appropriate standard of review to be applied in this case. In *People v. Lawson*, 67 Ill. 2d 449, 455 (1977), we held that a trial court has the inherent authority to dismiss an indictment in a criminal case for any reason given in section 114-1 of the Code of Criminal Procedure of 1963 or where there has been a clear denial of due process. Defendant contends that the State has conceded the existence of the cooperation agreement and that defendant's due process rights were violated because he incriminated himself in reliance upon the promise that was made to him to secure his cooperation. Thus, defendant argues, the only issue is whether dismissal of the indictment was the proper remedy. This is a matter left to the discretion of the trial court. *People v. Ziobro*, 242 Ill. 2d 34 (2011). Defendant, therefore, argues that the abuse of discretion standard is applicable here.

¶ 34    While the State agrees that a trial court's decision on the appropriate remedy for a violation of due process is subject to an abuse of discretion standard of review, the State contends that, here, there are several preliminary issues which must be decided, including whether the cooperation agreement was valid; whether the validity of the cooperation agreement has an impact on the finding of a due process violation; and whether, as the appellate court found, defendant's due process rights can be protected by suppression of his incriminating statements at trial. The State maintains that these are questions of law subject to *de novo* review.

¶ 35    Generally, a reviewing court considers a trial court's ultimate ruling on a motion to dismiss charges under an abuse-of-discretion standard, but where the issues present purely legal questions, the standard of review is *de novo*. See *People v. King*, 366 Ill. App. 3d 552 (2006); *People v. Brener*, 357 Ill. App. 3d 868, 870 (2005). Whether a defendant was denied due process, and whether that denial was sufficiently prejudicial to require the dismissal of the charges, are questions of law, which are reviewed *de novo*. See *People v. Oliver*, 368 Ill. App. 3d 690, 695 (2006); *People v. Mattis*, 367 Ill. App. 3d 432, 435-36 (2006); *People v. Anaya*, 279 Ill. App. 3d 940, 945 (1996). However, once it is determined that a defendant suffered a prejudicial violation of his due process rights, the trial court's decision on the appropriate remedy—whether it be dismissal of the indictment or some other remedy—is reviewed for an abuse of discretion. *Oliver*, 368 Ill. App. 3d at 695; *Mattis*, 367 Ill. App. 3d at 436.

¶ 36                          Cooperation Agreement
¶ 37    Defendant maintains that the issue before us, *i.e.*, the proper remedy for the State's breach of a fully performed cooperation agreement, is one of first impression for this court. The only Illinois case directly on point is *People v. Schmitt*, 173 Ill. App. 3d 66 (1977). In *Schmitt*, the

defendant was tried and convicted for delivery of a controlled substance. On appeal, he argued that the trial court erred in denying his motion to dismiss the indictment. In the motion to dismiss, Schmitt maintained that agents of the Illinois Department of Law Enforcement had entered into an agreement with him in which they promised that if he cooperated in the production of his "suppliers" he would not be prosecuted for his conduct. Thereafter, pursuant to those promises, Schmitt cooperated, which enabled the agents to arrest and develop information which led to the prosecution of his supplier. Schmitt maintained that his due process rights were violated because he was prosecuted in violation of this agreement. The trial court did not consider whether due process required dismissal of the charges. Instead, the trial court held, " 'There is no admission here the prosecutor was involved in the police officer's conduct and when you raise contract notions there certainly is no admission that the police officers were specifically the prosecutor's agent for making a determination as to whether or not charges would be filed with respect to this case. Accordingly, I do not believe that a motion to dismiss lies and the motion to dismiss is denied.' " *Id.* at 100.

¶ 38    The appellate court reversed defendant's conviction, finding it was error for the trial court to fail to consider whether the defendant's due process rights had been violated by the State's conduct. Citing our decision in *People v. Starks*, 106 Ill. 2d 441 (1985), the court held:

> "He cooperated with the agents in apprehending his drug source, a tactic unequivocally desired by law enforcement and readily accepted by the courts in the never-ending struggle to curb and combat the nefarious enterprise of drug trafficking and usage. The State should be required to fulfill its part of the agreement. A contrary holding would greatly impair if not totally defeat the viable weapon of drug offenders' cooperation with law enforcement in the drug war arsenal. More importantly, a contrary holding would constitute judicial approval of the government violating its agreement, a reprehensible aberration." *Schmitt*, 173 Ill. App. 3d at 101.

¶ 39    The appellate court then remanded the matter to the circuit court "with directions to conduct an evidentiary hearing to determine the terms of the cooperation agreement between Schmitt and the agents and *** dismiss the indictment against him if the agents violated the agreement." *Id.* at 106.

¶ 40    Relying on *Schmitt*, defendant contends that the appellate court in this case erred in reversing the circuit court's dismissal of the indictment. Defendant maintains the substantive due process issue at the heart of this case is not whether defendant can receive a fair trial (procedural due process) but, rather, whether prosecution of defendant is consistent with substantive due process guarantees where he was promised he would not be charged if he cooperated and, in reliance on that promise, he did everything asked of him. Defendant argues his performance under the agreement included more than making incriminatory statements, and, therefore, suppression of statements would not return him to his precooperation position.

¶ 41    Defendant also rejects the State's claim that, because the State's Attorney did not authorize the cooperation agreement, the State was not bound by it. Defendant maintains that an agreement not to charge is left to the discretion of the police, independent of the prosecutor's authority. Moreover, in this case, the State raised the validity of the agreement for the first time in its motion to reconsider, and, therefore, there is no evidence of record that the prosecutor was unaware of the agreement.

¶ 42    Further, even if this court should agree that police officers do not have the authority to enter into a cooperation agreement to not file charges, defendant relies on *United States v. Carrillo*, 709 F.2d 35 (9th Cir. 1983), *United States v. Rodman*, 519 F.2d 1058 (1st Cir. 1975), and *State v. Wacker*, 688 N.W.2d 357 (Neb. 2004), for the proposition that, where it is shown that he detrimentally relied upon the agreement and that reliance was of constitutional proportion because he incriminated himself further by participating in the controlled delivery, the failure to enforce the agreement would be fundamentally unfair and a violation of his substantive due process rights.

¶ 43    The State asks that we affirm the appellate court judgment and find that the circuit court erred when it dismissed the charges against defendant. The State admits that in *People v. Starks*, 106 Ill. 2d 441 (1985), we held that due process requires the State to honor a cooperation agreement when a defendant fully performs and, if the State fails to honor the agreement, dismissal of the charges is proper. The State contends, however, that our holding in *Starks* should not be extended to situations, as here, where the agreement was entered into by police officers without the approval of the State's Attorney. According to the State, police officers have no "free-standing" authority to bind the State to nonprosecution agreements or to take a lead role in "charge-bargaining" because that discretion belongs exclusively to the prosecutor. Therefore, the State argues that the prosecutor need not specifically perform a police officer's unauthorized nonprosecution agreement. The State asks that, to the extent that *Schmitt* holds to the contrary, it should be overruled.

¶ 44    The State further argues that, while it is true that dismissal of an indictment is proper if no fair trial can be held, that is not the case here because suppression of defendant's statement is an adequate remedy.

¶ 45    We disagree with the State's position. In *People v. Smith*, 233 Ill. App. 3d 342 (1992), our appellate court held that cooperation agreements were designed, "in the context of the illegal drug trade, to enable law enforcement officers to apprehend large-scale drug dealers, 'a tactic unequivocally desired by law enforcement and readily accepted by the courts in the never-ending struggle to curb and combat the nefarious enterprise of drug trafficking and usage.' " *Id.* at 349-50 (quoting *Schmitt*, 173 Ill. App. 3d at 101). "Persons who enter into cooperation agreements with the government in criminal cases do so because they are in serious legal difficulties and are seeking to avoid or ameliorate their problems by furnishing information in pending investigations. The bargaining positions are not equal. The government has the upper hand. For this reason, extensive state and federal legal authority requires that governmental agencies deal fairly with a defendant in offers of immunity *** to obtain a waiver of constitutional rights in exchange for information exposing him to additional criminal liability." *People v. Dasaky*, 303 Ill. App. 3d 986, 996 (1999) (McNulty, J., dissenting) (citing *United States v. Knights*, 968 F.2d 1483 (2d Cir. 1992), *United States v. Rexach*, 896 F.2d 710 (2d Cir. 1990), and *People v. Raymond*, 202 Ill. App. 3d 704 (1990)).

¶ 46    Cooperation agreements are neither plea agreements nor a grant of immunity. See *Wacker*, 688 N.W.2d at 362. They arise when the State agrees to limit a prosecution in some manner in consideration for the defendant's cooperation. *Id.* Such agreements differ from plea agreements "in that the detrimental reliance for a plea agreement is the defendant's waiver of the right to a trial [citation], whereas [w]ith an agreement not to prosecute, parties agree that the defendant's cooperation is sufficient consideration for the government's promise of

immunity." (Internal quotation marks omitted.) *Smith*, 233 Ill. App. 3d at 349. The due process implications in each situation are different. In the plea agreement scenario, if the defendant has not yet pled guilty, he may still proceed to trial. *Id.* In the cooperation agreement situation, "it is the violation of 'the right not to be haled into court at all *** [which] operate[s] to deny [defendant] due process of law.' " *Id.* at 350 (quoting *Blackledge v. Perry*, 417 U.S. 21, 30-31 (1974)).

¶ 47    Courts construe cooperation agreements under contract principles. 2 Crim. Prac. Manual § 45.19. Such agreements are construed strictly against the government and courts should not hesitate to scrutinize the government's conduct to ensure it comports with the highest standard of fairness. *Id.*

¶ 48    The principle for enforcing cooperation agreements is the due process clause of the fourteenth amendment. *Wacker*, 688 N.W.2d at 362; *People v. Manning*, 672 P.2d 499, 504 (Colo. 1983) (*en banc*). "Generally, fundamental fairness requires that promises made during plea-bargaining and analogous contexts be respected." (Internal quotation marks omitted.) *Wacker*, 688 N.W.2d at 362. "[W]here the government has entered into an agreement with a prospective defendant and the defendant has acted to his detriment or prejudice in reliance upon the agreement, as a matter of fair conduct, the government ought to be required to honor such an agreement." (Internal quotation marks omitted.) *Id.*

¶ 49    In *Starks*, Justice Ward stated:

"Case law also dictates that when the 'totality of circumstances' surrounding the government misconduct is such as to offend basic tenets of fair play and justice, dismissal of the indictment with prejudice is proper." (Internal quotation marks omitted.) *Starks*, 106 Ill. 2d at 453 (Ward, J., dissenting, joined by Moran and Miller, JJ.).

¶ 50    The trial court has inherent authority to dismiss a criminal indictment where the defendant has been denied due process. *People v. Lawson*, 67 Ill. 2d 449, 454-56 (1977). Due process is a fundamental premise of our system of justice, designed to protect an individual's personal and property rights from arbitrary and capricious governmental action. *People v. McCauley*, 163 Ill. 2d 414, 441 (1994); *People v. Schmitt*, 173 Ill. App. 3d 66, 97 (1988).

¶ 51    In *McCauley*, we held that due process is implicated "whenever the State engages in conduct towards its citizens deemed oppressive, arbitrary or unreasonable." 163 Ill. 2d at 425. Further, since the essence of due process is "fundamental fairness," due process essentially requires "fairness, integrity, and honor in the operation of the criminal justice system, and in its treatment of the citizen's cardinal constitutional protections." (Internal quotation marks omitted.) *Id.* at 441. To violate substantive due process, the government's conduct must " 'shock[ ] the conscience' " and violate the " 'decencies of civilized conduct.' " *In re Detention of Sveda*, 354 Ill. App. 3d 373, 380 (2004) (quoting *Rochin v. California*, 342 U.S. 165, 172, 173 (1952)).

¶ 52    Based on these principles, we find that defendant's substantive due process rights were violated when the State breached the agreement Masterson entered into with defendant. Accordingly, we find that the trial court did not abuse its discretion in granting defendant's motion to dismiss.

¶ 53    The State maintains that prosecutors are not bound by an agreement or promise not to prosecute made by law enforcement officers (see *United States v. McInnis*, 429 F.3d 1, 5-6 (1st

Cir. 2005); *United States v. White*, 270 F.3d 356, 366-67 (6th Cir. 2001); *Commonwealth v. St. John*, 54 N.E. 254, 254 (Mass. 1899); *Commonwealth v. Stipetich*, 652 A.2d 1294, 1295 (Pa. 1995); *State v. Reed*, 879 P.2d 1000, 1002 (Wash. Ct. App. 1994)) and that the proper remedy in this case is to suppress any incriminating statements defendant may have made in the course of his cooperation with police. We disagree and find the cases cited above to be distinguishable, either factually or because they did not address due process.

¶ 54    We find the dissent in *Stipetich* to be persuasive. In *Stipetich*, the State appealed the trial court's dismissal of a criminal complaint against two defendants. The criminal complaint was brought ten months after a search of the defendant's home yielded small amounts of various controlled substances. The investigating officers had agreed not to charge the defendants for narcotics violations if they cooperated fully with the police. The agreement not to prosecute was declared invalid by the majority because it was not entered into with the approval of the district attorney. However, the dissenting justice held:

> "I cannot agree that the 'validity' of the agreement is the controlling issue in this case. Rather, I believe the rights of the defendants to due process, that concept by which we guarantee an accused fundamental fairness and substantial justice, should be the proper focus of this Court's attention. [Citation.]

> None of the parties contest the fact that an agreement was entered into, and that the defendants completely fulfilled their obligations under that agreement. Therefore, the 'validity' of the agreement is not important. Of course, I concede that police officers do not have any authority to bind a district attorney by entering into non-prosecution agreements. Such a result would be absurd. However, when an agreement is negotiated due process requires that the defendants, who fulfilled their obligations under that agreement be treated with fairness and justice. Having a court decide how to best protect the rights of the accused, as was done here, does not, by any stretch of the imagination, mean that non-prosecution agreements entered into by police officers will bar the district attorney from subsequently deciding to pursue a prosecution. The judiciary, in its supervisory power, always has the authority to fashion a remedy that meets the needs of the situation at hand. It is precisely this power of the court to fashion a remedy which negates the majority's fear that the police will usurp the proper functions and authority of the district attorney." 652 A.2d at 1296 (Cappy, J., dissenting).

¶ 55    In the case at bar, the trial court determined that Masterson entered into a cooperation agreement with defendant in which she promised not to charge defendant with possession of ketamine if he assisted in the apprehension of Malcolm and Blair. The court further found that defendant fulfilled his obligations under the agreement and that his due process rights were violated when, over a year after defendant was detained by police in this matter, he was charged with possession of ketamine. Under these circumstances, we cannot say that the trial court abused its discretion by granting defendant's motion to dismiss the charge. Whether or not the cooperation agreement was "valid" in the sense that it was approved by the State's Attorney, is not important. An unauthorized promise may be enforced on due process grounds if a defendant's reliance on the promise has constitutional consequences. *People v. C.S.A.*, 104 Cal. Rptr. 3d 832, 835, 837 (Cal. Ct. App. 2010) (collecting cases). In this case, the trial court found that defendant relied upon the nonprosecution agreement he made with police and

incriminated himself in the process of fulfilling his obligations under the agreement. Thus, defendant suffered a prejudicial violation of his due process rights. The governmental conduct here "shocks the conscience" and violates the "decencies of civilized conduct."

¶ 56　　　　We reverse the appellate court judgment, affirm the judgment of the trial court, and remand with instructions that the charge against defendant be dismissed.

¶ 57　　　　Appellate court judgment reversed.

¶ 58　　　　Circuit court judgment affirmed.

¶ 59　　　　Cause remanded.