2026 IL App (2d) 240776
No. 2-24-0776
Opinion filed February 10, 2026

IN THE

APPELLATE COURT OF ILLINOIS

SECOND DISTRICT

THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellant,
v. JANET E. KILKELLY, Defendant-Appellee.

Appeal from the Circuit Court of Lake County.
Honorable Patricia S. Fix, Judge, Presiding.
No. 24-CF-546

JUSTICE SCHOSTOK delivered the judgment of the court, with opinion.
Justices McLaren and Hutchinson concurred in the judgment and opinion.

**OPINION**

¶ 1 An indictment charged defendant, Janet E. Kilkelly, with 5 counts of misapplication of funds (720 ILCS 5/33E-16(a) (West 2022)) and 10 counts of official misconduct (*id.* § 33-3(a)(1), (a)(2)). Defendant moved to dismiss the indictment, arguing that the statutory provision underlying the charges for misapplication of funds was inapplicable to her alleged conduct and that the indictment for official misconduct was obtained through the presentation of false or misleading evidence. Following a hearing, the trial court granted the motion. The State appeals from that order. We affirm.

¶ 2                                    I. BACKGROUND

¶ 3 On December 21, 2020, the City of Waukegan (City) passed a resolution (Resolution) providing a one-time COVID-19 relief credit toward 2021-22 liquor and video gaming license fees for qualifying businesses. In relevant part, the Resolution provided:

"For the City of Waukegan local liquor and video gaming licenses issued pursuant to the City of Waukegan Code of Ordinances Chapter 3, and for all licensees in good standing during the period of May 1, 2020 through April 30, 2021, and with licenses displaying an expiration date of April 30, 2021, the license renewal fees for the May 1, 2021 to April 30, 2022 license year, as defined in Sections 3-55 and 3-79 of the City Code, shall be granted a 25% credit on their timely 2021-2022 renewal. This shall not apply to any business which was not in good standing at the time of renewal, or which did not have a license during the entire prior fiscal year (May 1, 2020, to April 30, 2021). This credit shall also not be provided to any late filing licensee. This credit is not transferrable, and expires on August 1, 2021." City of Waukegan Resolution No. 20-R-95 (eff. Dec. 21, 2020).

The Resolution was passed by the City Council, signed by the mayor, Sam Cunningham, and attested to by defendant.

¶ 4 On March 13, 2024, defendant was indicted on five counts of official misconduct (720 ILCS 5/33-3(a)(1) (West 2022) (intentional or reckless conduct)), five counts of official misconduct (*id.* § 33-3(a)(2) (knowing conduct)), and five counts of misapplication of funds (*id.* § 33E-16(a)). The offenses related to approving the subject credit for five businesses that were allegedly not in good standing, as required by the Resolution. The approvals took place in May and June 2021. There were three separate counts for each business, two counts of official misconduct and one count of misapplication of funds, related to credits granted to the five following businesses: Live Star Banquet Hall, Inc., Isla Del Mar #2, Taqueria Toluca #2, Golf Road Citgo, and C.Y.O.C.

¶ 5 The misapplication of funds counts alleged that, in violation of section 33E-16(a) (*id.*), on the specified date, "defendant, a public officer, being City Clerk and Deputy Local Liquor Control

- 2 -

Commissioner for the City of Waukegan," approved a credit for liquor and gaming fees for the specified business despite knowing that the business was not eligible to receive the credit under the Resolution. For the counts alleging official misconduct under section 33-3(a)(1) (*id.* § 33-3(a)(1)), each count alleged that defendant, in her official capacity as city clerk and deputy local liquor control commissioner, intentionally or recklessly failed to perform a mandatory duty as required by law, in that, on the specified date, she failed to deny the business's application for the subject credit despite knowing that the business was not eligible for the credit under the requirements of the Resolution. For the counts alleging official misconduct under section 33-3(a)(2) (*id.* § 33-3(a)(2)), each count alleged that defendant, in her official capacity as city clerk and deputy local liquor control commissioner, knowingly performed an act she was forbidden by law to perform in that, on the specified date, she approved the application of the business for the subject credit despite knowing that the business was not eligible for the credit under the Resolution.

¶ 6 To establish probable cause for the charges in the bill of indictment, the State presented the grand jury with the testimony of one witness, Illinois State Police Officer David Juergensen of the special investigations unit. Juergensen testified that defendant was elected city clerk in 2017, was reelected in 2021, and continued to serve in that role. As the city clerk, defendant functioned as an election official, legislative administrator, and records manager. Juergensen stated that defendant submitted a letter to the city council proposing the Resolution to grant a 25% credit for liquor and video-gaming license fees to businesses that were in good standing for at least one year. The Resolution was presented to and approved by the city council. The mayor signed it, and defendant attested to his signature. Juergensen further testified that, under a City ordinance, the mayor served as the local liquor control commissioner and was authorized to appoint one deputy local liquor control commissioner. In 2017, Mayor Sam Cunningham appointed defendant as the deputy

- 3 -

commissioner, and she remained in that position through June 2021. In that role, defendant possessed final authority to approve liquor and gaming licenses, including determining associated costs and payments due. Also in that role, she evaluated the applications of businesses seeking the COVID-19 relief credit at issue.

¶ 7    Juergensen further testified that during a separate unrelated investigation he obtained memoranda, from defendant to the City's finance committee, for every business that applied for the COVID-19 credit. He discovered that defendant approved and issued the COVID-19 relief credit to approximately 80 businesses that, according to the memoranda, were not in good standing. He testified that defendant issued credits to Live Star Banquet Hall, which lacked fire department and water department approvals and was not current on its food and beverage taxes; Isla del Mar #2, which owed food and beverage taxes and late fees dating back to 2019; Taqueria Toluca #2, whose water bill, business license, and food and beverage fees were past due dating back to 2019; Golf Road Citgo, whose business license fee and food and beverage taxes were past due dating back to 2019; and C.Y.O.C., whose business license fees and food and beverage taxes were likewise delinquent dating back to 2019.

¶ 8    At the conclusion of Juergensen's testimony, the State asked the grand jurors whether they had any questions. One juror asked, "Was she getting anything out of like over-approving these credits for the businesses that were in good standing?" Juergensen replied that there was no indication defendant received any financial gain. Another juror asked, "What was her explanation? Why did she do that?" Juergensen responded that she never offered an explanation. A third juror asked, "Are there any situations *** that would have a business in bad standing be able to get that COVID credit, or is it a blanket you need to be in good standing overall ***?" Juergensen

- 4 -

responded that the Resolution specifically required that a business be in good standing to receive the credit.

¶ 9 On June 28, 2024, defendant filed a motion to dismiss all counts of the indictment. With respect to the five counts alleging misapplication of funds, defendant argued that the statute at issue, section 33E-16(a) (720 ILCS 5/33E-16(a) (West 2022)), applied specifically to public contracts and that her alleged actions did not relate in any manner to public contracts. Regarding the counts alleging official misconduct, defendant first argued that dismissal was warranted because Juergensen's testimony before the grand jury, that she had been appointed deputy commissioner, was false and misleading because she was never appointed to that position and thus lacked authority to approve the applications for the subject credit. Defendant next argued that, because the term "good standing" was never defined, she could not have intentionally or recklessly failed to perform an act required by law, nor could she have knowingly performed an act she knew was forbidden by law. She asserted that, after the Resolution was passed, she was tasked with determining which businesses qualified for the credit. To do so, she circulated a memorandum (the 2021 memoranda) for each business to assess whether it was in good standing with the police, fire, building, water, license, and food and beverage departments.[1] All five businesses underlying the indictment were in good standing with at least three of these six departments. She therefore contended that she could not be held criminally liable where "good standing," as used in the Resolution, was undefined and there was no evidence that she knew what the term meant.

---

[1]The record shows that there were actually eight categories that were part of the memoranda surveying whether each business was in good standing with the City's various departments but that two of those categories were not applicable to each of the five businesses.

¶ 10    On July 22, 2024, the State filed its response to the motion to dismiss. Regarding the charges for misapplication of funds, the State argued that section 33E-16(a) (720 ILCS 5/33E-16(a) (West 2022)) did not reference "public contracts" and that it therefore applied to defendant's conduct. As to the official misconduct charges, the State contended that whether defendant had been appointed deputy commissioner and whether she violated the Resolution's "good standing" requirement were factual issues inappropriate for dismissal at the indictment stage. The State argued that good standing required no definition because a business was either in good standing or it was not.

¶ 11    The trial court held a hearing on defendant's motion to dismiss beginning October 16, 2024. Robert Long testified that he served as corporation counsel for the City from mid-2017 to mid-2021, while Sam Cunningham was the mayor. In that role, Long drafted ordinances and resolutions, including the City's liquor control ordinance, under which the mayor served as the commissioner with authority to issue or renew licenses and appoint a deputy commissioner. Long testified that Cunningham never appointed defendant as deputy commissioner and that, regardless, only the commissioner had authority to issue or renew licenses.

¶ 12    Long further testified that, during the pandemic, the City implemented emergency measures to assist businesses affected by mandated closures. He drafted the Resolution in consultation with the mayor, the clerk, the finance director, the police chief, the fire chief, the planning director, and the water and public works department. He included the "good standing" requirement to ensure that licensees were in compliance with important laws, not for minor issues like unpaid water bills. Good standing, as Long defined it, meant that a license was not suspended, revoked, lapsed, or involved in ongoing litigation or disputes before the commissioner or the courts. For example, an establishment with serious police activity, structural problems, and

significant unpaid bills would not qualify. Long clarified that "good standing" was not intended to require a zero balance on all accounts; rather, the goal was to provide relief to businesses genuinely struggling to pay bills.

¶ 13    The defense played a video of the finance and purchasing committee meeting on December 21, 2021, which was the only meeting where the Resolution was discussed. Afterward, it was placed on the consent agenda and passed by the city council. Long acknowledged that neither at that meeting nor during the council vote was "good standing" defined, let alone defined to require a zero balance with every department. Long acknowledged that People's exhibit No. 9, an e-mail from Finance Director Tina Smigielski to her assistant (Douglas Dorando), dated December 16, 2020, stated that to qualify for the COVID-19 credit, establishments must be in good standing with the City at the time the invoice is generated (*i.e.*, "no debts owed to the City relative to license fees, water [and] sewer charges, code violations, et cetera.") Defendant was copied on the e-mail.

¶ 14    Sam Cunningham testified that he was the City's mayor from May 3, 2017, to May 3, 2021, during which time defendant served as city clerk. As mayor, he was also the liquor control commissioner. He never appointed defendant to the role of deputy commissioner. He could not define "good standing" and explained that the Resolution's goal was to provide COVID-19 relief to City businesses by reducing fees for business, liquor, and gaming licenses. He never discussed the meaning of "good standing" with defendant, trusting that staff and corporation counsel would determine and apply the definition. He noted that if 80 of the 109 businesses that applied for the COVID-19 credit had been excluded from relief due to minor debts, the Resolution would not have served its purpose. Cunningham acknowledged that outstanding debts for various departments might normally factor into granting a credit, but for the COVID-19 credit, the goal was to help local businesses reopen, so minor delinquencies were not determinative.

¶ 15 When asked whether he had delegated responsibility for the COVID-19 credit to defendant, Cunningham said no. He was shown a January 6, 2021, e-mail from the City's director of operations, Thomas Maillard, to defendant, in which Maillard stated that, after speaking with the mayor, compliance with the food and beverage audit was not a desired stipulation for receiving this credit and that "the final call on applying the credit will not reside with any one department, but rather be at the determination of the Clerk." Cunningham stated that he was not included on that e-mail and that the final decision on credit approval would likely have been made collectively by all the departments involved. He reiterated that the purpose of the COVID-19 credit was to help local businesses reopen; minor debts, such as $32.67 owed to the food and beverage department, were not a reason to deny it.

¶ 16 Ann Taylor testified that she was elected to be the City's mayor and took office on May 4, 2021. As such, she was the liquor control commissioner on the dates that defendant was alleged to have committed the offenses set forth in the indictment. She never appointed defendant as deputy commissioner. Taylor had been an alderman when the Resolution was drafted and voted to pass it. As mayor, she had no involvement in decisions regarding who received the COVID-19 credit. Rather, defendant made all decisions regarding which businesses received the COVID-19 credit.

¶ 17 Juergensen testified that he had worked 35 years in law enforcement, including 13 years with the Illinois State Police. In 2022, he began investigating the City's casino bidding process, which led to the investigation of defendant. He acknowledged that, before the grand jury, he testified that Cunningham had appointed defendant as deputy commissioner, but he had never interviewed Cunningham. Defendant never identified herself as deputy commissioner but indicated she had authority to approve or deny licenses, which led him to assume she was appointed to that role.

¶ 18    Juergensen acknowledged that the Resolution did not define "good standing," nor did any documents he received during his investigation. He never interviewed the City's attorney, Long, or anyone else to determine who drafted the Resolution. He did not care who drafted it and did not come up with his own definition, though he had a personal idea of its meaning. His investigation found no evidence of communications to defendant defining "good standing." He testified that defendant attended finance committee meetings where the term was discussed but acknowledged that "good standing" was not defined in those meetings. He discovered documents showing that credits were given to businesses that were not in good standing in certain categories. When asked whether anything else would have provided a definition making defendant aware that noncompliance could lead to indictment, imprisonment, or loss of her pension, Juergensen said no.

¶ 19    On cross-examination, Juergensen testified that, during his investigation, he learned that businesses had to be in good standing to receive the COVID-19 credit and that defendant made those decisions. Of the City's 155 liquor-license holders, 80 received the credit despite not being in good standing, resulting in $177,827 in credits.

¶ 20    In closing, defendant argued, in relevant part, that she was denied due process because the State presented false and misleading testimony to the grand jury regarding her alleged appointment as deputy commissioner and the meaning of "good standing" under the Resolution. Defendant noted that the testimony at the dismissal hearing established that she was never appointed to the position of deputy commissioner and thus never possessed final decision-making authority to approve the COVID-19 credits. She further argued that the testimony at the dismissal hearing also demonstrated that the term "good standing" was never defined. Consequently, Juergensen's testimony that the five businesses identified in the indictment were not in good standing because they were delinquent in paying water bills or food and beverage taxes was false and misleading

and stemmed from a reckless investigation that failed to include interviews of the mayor or the individual who drafted the Resolution. Defendant contended that she was prejudiced because, absent the false and misleading testimony, the grand jury would not have returned an indictment. Accordingly, she argued that all counts of the indictment should be dismissed on due process grounds.

¶ 21    With respect to due process, the State argued there was no false or misleading testimony and thus no due process violation. The State asserted that, even if defendant was never appointed as deputy commissioner, the evidence showed that she was responsible for approving the COVID-19 credits. The State further contended that the meaning of good standing was obvious and did not require an explicit definition, which explained why none existed. The State implicitly asserted that good standing required a business to be in good standing with each of the City's various departments that were consulted on the matter in the 2021 memoranda.

¶ 22    Following closing arguments, the trial court took the matter under advisement and, on November 22, 2024, granted defendant's motion to dismiss the indictment in a 10-page written order. The court found Juergensen's testimony that defendant had been appointed deputy commissioner to be false and misleading, as the evidence showed she was never appointed to that position. The court further found his testimony that defendant violated the Resolution by granting COVID-19 credits to businesses that were not in good standing to be misleading because the Resolution did not define "good standing" and Juergensen provided no evidence of how the term was otherwise defined. Without a clear definition of good standing, the State could not prove a violation of the Resolution and, therefore, could not establish official misconduct or misapplication of funds. The trial court concluded that the misleading evidence violated defendant's right to due

process and caused actual and substantial prejudice because it comprised the entirety of the State's probable cause evidence.

¶ 23    At a later hearing, the trial court denied the State's oral motion to clarify whether the dismissal was with prejudice, stating that it had already issued a 10-page order and would not clarify it further. The court stated that, if the State wanted clarification, it would need to file a written motion. The State did not file such a motion and instead filed a timely notice of appeal.

¶ 24                                    II. ANALYSIS

¶ 25    On appeal, the State argues that the trial court erred in granting defendant's motion to dismiss the indictment on due process grounds. The State asserts that, even if defendant was not appointed deputy commissioner, there was sufficient evidence that she acted in that capacity. The State further contends that "good standing" did not require definition—that a business was either in good standing because it was in compliance with all the City's departments or it was not. Additionally, although the trial court made no determination on the issue, the State argues that the underlying section of the misapplication of funds statute is not limited to public contracts and therefore applies to defendant's alleged conduct in improperly granting the COVID-19 credits. The State requests that we reinstate the indictment, remand for further proceedings, and order that the case be assigned to a new trial court judge on remand.

¶ 26    The role of a grand jury is to determine whether probable cause exists that a person has committed an offense, thus warranting a trial. *People v. DiVincenzo*, 183 Ill. 2d 239, 254 (1998), *abrogated on other grounds by People v. McDonald*, 2016 IL 118882. Prosecutors advise the grand jury of the proposed charges and the pertinent law. *Id.* "The grand jury process is an invaluable part of our system of criminal justice." *People v. Basile*, 2024 IL 129026, ¶ 29. "The grand jury serves as an accusatory body that brings to trial those who may be guilty of a crime [citation], but

just as importantly, it also stands as a shield between citizens and the State and secures 'the innocent against hasty, malicious[,] and oppressive prosecution.' " *Id.* (quoting *Wood v. Georgia*, 370 U.S. 375, 390 (1962)).

¶ 27 Generally, a defendant may not challenge the validity of an indictment returned by a legally constituted grand jury or challenge the sufficiency of the evidence considered by a grand jury as long as some evidence was presented. *DiVincenzo*, 183 Ill. 2d at 255. Nonetheless, it is well settled that a trial court may dismiss an indictment if the defendant has suffered a prejudicial denial of due process. "[T]he grand jury is an integral part of the court and not the tool of the prosecutor and neither the prosecutor nor the grand jury is vested with power to proceed without regard to due process." *People v. Sears*, 49 Ill. 2d 14, 36 (1971); see also *Basile*, 2024 IL 129026, ¶ 32 (recognizing a court's "inherent power to supervise and prevent perversion of the grand jury's process"). "The due process rights of a defendant may be violated if the prosecutor deliberately or intentionally misleads the grand jury, uses known perjured or false testimony, or presents other deceptive or inaccurate evidence." *DiVincenzo*, 183 Ill. 2d at 257. To warrant dismissal, the denial of due process must be unequivocally clear, and the prejudice must be actual and substantial. *People v. Oliver*, 368 Ill. App. 3d 690, 694-95 (2006). Prosecutorial misconduct resulting in a due process violation is actually and substantially prejudicial only if the grand jury would not have otherwise indicted the defendant. *People v. Legore*, 2013 IL App (2d) 111038, ¶ 23; see also *Basile*, 2024 IL 129026, ¶ 42 (dismissal of an indictment due to prosecutorial misconduct is appropriate where the misconduct substantially influenced the grand jury's decision to indict).

¶ 28 "[A] reviewing court considers a trial court's ultimate ruling on a motion to dismiss charges under an abuse-of-discretion standard, but where the issues present purely legal questions, the standard of review is *de novo*." *People v. Stapinski*, 2015 IL 118278, ¶ 35. Determining whether a

defendant was deprived of due process, and whether such a deprivation caused sufficient prejudice to warrant dismissal of the charges, presents questions of law subject to *de novo* review. *Id.* However, once a reviewing court determines that a defendant's due process rights were violated in a manner that caused prejudice, the trial court's choice of remedy, including dismissal or another form of relief, is reviewed for an abuse of discretion. *Id.* Accordingly, we review *de novo* the due process and prejudice determinations but will reverse dismissal of the indictment only if the trial court abused its discretion.

¶ 29     In the present case, the record clearly demonstrates that the State presented deceptive and inaccurate evidence to the grand jury, thereby denying defendant due process. *Oliver*, 368 Ill. App. 3d at 695-96 (a defendant is denied due process when the State presents the grand jury with deceptive or inaccurate evidence, even if the deception or inaccuracy is unintentional). All of the charges in the indictment alleged that defendant committed misapplication of funds and official misconduct knowing that the businesses were not eligible to receive the COVID-19 credit under the requirements of the Resolution. At the grand jury hearing, Juergensen testified that the five businesses identified in the indictment were not eligible to receive the credit because they were not in "good standing." He explained that this conclusion was based on defendant's 2021 memoranda, which reflected that each business was not in good standing with certain City departments due to matters such as delinquent water bills, license fees, and food and beverage taxes. Further, in response to a grand juror's question as to whether a business had to be in good standing "overall" to receive the credit, Juergensen replied that the Resolution specifically required that a business had to be in good standing to receive the credit. This testimony and response implied that the "good standing" required as a prerequisite to receiving the credit meant being in good standing with all six of the City's departments that responded to defendant's 2021 memoranda.

¶ 30    However, the hearing on the motion to dismiss made clear that "good standing" was never defined and that defendant therefore could not have granted the credits knowing that the businesses were not eligible to receive them. The testimony at the hearing established that "good standing" was not defined in the Resolution, by defendant's colleagues, or in any related documents. Juergensen specifically testified that nothing he observed during his investigation provided a definition of "good standing." He acknowledged that the Resolution did not define the term, that it was not defined during any finance committee meetings, and that no documents he reviewed during his investigation supplied such a definition. He further testified that he did not interview the individual who drafted the Resolution or the mayor to determine its intended meaning. Moreover, when asked whether there was anything that would have provided a definition such that defendant was informed that noncompliance could result in indictment, imprisonment, or loss of her pension, Juergensen responded that there was not. In the absence of a definition of "good standing," the State's theory improperly shifts the burden of proof to defendant to establish eligibility, rather than requiring the State to prove that the businesses were ineligible.

¶ 31    Additional testimony and evidence at the dismissal hearing likewise demonstrated that "good standing" was never defined. Long, who drafted the Resolution, testified that the term was not intended to require a zero balance on the accounts for each department but rather to provide relief to businesses generally struggling to pay bills. He further testified that the city council never defined "good standing." Cunningham, the City's mayor, testified that he could not define the term, never discussed its meaning with defendant, and believed that excluding 80 of the 109 applicant businesses due to minor debts would have rendered the Resolution meaningless.

¶ 32    We acknowledge that a December 16, 2020, e-mail from the City's finance director to Long's assistant stated that, to qualify for the COVID-19 credit, businesses must be in good

standing with the City at the time the invoice was generated, which the e-mail described as having "no debts owed to the City relative to license fees, water [and] sewer charges, code violations, *et cetera*." However, this e-mail reflected only one person's definition and did not establish any consensus on the matter. Moreover, the same e-mail thread suggested that compliance with the food and beverage audit was required to be considered in good standing, yet a January 6, 2021, e-mail from the City's director of operations stated that, after consulting with the mayor, such compliance was not a desired stipulation for receiving the credit.

¶ 33    In light of the foregoing, Juergensen's grand jury testimony regarding "good standing" was deceptive and inaccurate. He testified unequivocally that the five businesses at issue received the COVID-19 credit despite not being in good standing. The testimony and evidence at the dismissal hearing, however, clearly demonstrated that no definition of "good standing" existed—a fact Juergensen ultimately acknowledged. It follows that, absent a definition of "good standing," and thus any meaningful standard by which defendant could assess compliance, the State could not prove that defendant violated the Resolution.

¶ 34    We next determine whether the due process violation was prejudicial. *Legore*, 2013 IL App (2d) 111038, ¶ 23; see also *Oliver*, 368 Ill. App. 3d at 694-95 (to warrant dismissal, a due process violation must result in actual and substantial prejudice). Here, the entirety of the State's case rested on the assertion—supported only by Juergensen's testimony—that defendant granted the subject credit to businesses that were not in "good standing" within the meaning of the Resolution. The testimony, however, established that neither the drafter of the Resolution, the mayor, nor the city council ever defined "good standing" as requiring good standing with each individual City department. Accordingly, absent Juergensen's deceptive and inaccurate testimony regarding "good standing," the grand jury would not have returned an indictment. We therefore affirm the dismissal

of the indictment. See *People v. Chatman*, 297 Ill. App. 3d 57, 62 (1998) (dismissal proper where the indictment is "utterly empty"); *People v. Hunter*, 298 Ill. App. 3d 126, 131 (1998) (dismissal appropriate where, if evidence was truthfully presented, it was distinctly possible the grand jury would not have returned an indictment).

¶ 35    The State argues that how and whether good standing was defined is a matter related to the sufficiency of the evidence and, therefore, not an appropriate basis for dismissal of the indictment. In support of this argument, the State relies on *Basile*, 2024 IL 129026, ¶ 65, which held that courts considering a motion to dismiss an indictment should not weigh the sufficiency of the evidence presented to the grand jury. In *Basile*, our supreme court reversed the dismissal of an indictment after concluding that sufficient probable cause evidence supported the indictment. *Id.* ¶ 69. The issue in that case was whether answers to a grand juror's questions led the grand jury to believe that the defendant had confessed to the offense. *Id.* ¶¶ 50-54. The court first determined that it was unclear whether the answers to the juror's questions constituted a due process violation but noted that, even if they did, the defendant suffered no actual or substantial prejudice. *Id.* ¶ 71. In assessing prejudice, the court explained that, even absent the challenged answers, the State had presented sufficient other evidence connecting the defendant to the charged offense to support the grand jury's finding of probable cause. *Id.*

¶ 36    We find the State's reliance on *Basile* unpersuasive. In *Basile*, our supreme court expressly contrasted the case with this court's decision in *Oliver*. *Id.* ¶ 70. The *Basile* court noted that, in *Oliver*, this court affirmed the dismissal of an indictment based on misleading testimony where the misleading evidence constituted the entirety of the State's probable cause evidence. *Id.* The present case is comparable to *Oliver*. Absent Juergensen's deceptive and inaccurate grand jury testimony, there was no other evidence defining good standing, and therefore, unlike *Basile*, there was not

sufficient other probable cause evidence to show that defendant violated the Resolution. Rather than acknowledging this absence of proof, the State improperly attempts to recast its evidentiary deficiency as defendant's burden to prove that she acted lawfully, even though the burden rests with the State to prove unlawful conduct. This deficiency stems not merely from the State's presentation to the grand jury but from the Resolution itself, which was adopted without defining the operative term "good standing" or establishing any objective criteria by which compliance could be measured. As a result, the grand jury was presented with a charge resting on an undefined standard, making Juergensen's inaccurate testimony the sole basis upon which the grand jury could conclude that defendant violated the Resolution. Defendant was thus subjected to a prejudicial denial of due process, and the State's assertion that we are improperly assessing the sufficiency of the evidence is without merit.

¶ 37    Having concluded that defendant suffered a prejudicial denial of due process, we next determine the appropriate remedy. As noted above, a trial court's decision regarding the appropriate remedy—whether dismissal of the indictment or some other remedy—is reviewed for an abuse of discretion. *Stapinski*, 2015 IL 118278, ¶ 35. A trial court abuses its discretion when its ruling is "arbitrary, fanciful, or unreasonable or when no reasonable person would agree with the stance adopted by the trial court." *People v. Applewhite*, 2016 IL App (4th) 140558, ¶ 57 (citing *People v. Becker*, 239 Ill. 2d 215, 234 (2010)). Dismissal of an indictment with prejudice is an extreme sanction. *People v. Mattis*, 367 Ill. App. 3d 432, 436 (2006).

¶ 38    In this case, the trial court did not expressly state whether the dismissal was with prejudice. However, based on the trial court's reasoning that the Resolution failed to define "good standing," the dismissal was implicitly with prejudice because the State could not cure that deficiency through a new indictment. We agree. The Resolution's failure to define "good standing" left no objective

- 17 -

standard for the State to apply in any subsequent indictment, as was its burden. Under these circumstances and in light of the inherent harm caused when an elected official is indicted based on the State's cursory presentation of inaccurate facts to the grand jury, we cannot say that the trial court abused its discretion in dismissing the indictment with prejudice. See *People v. Rodgers*, 92 Ill. 2d 283, 289-90 (1982) (a wrongful indictment "works a grievous, irreparable injury to the person indicted," and the resulting stigma cannot easily be erased even after an acquittal); see also *Oliver*, 368 Ill. App. 3d at 699 (dismissal with prejudice appropriate where an indictment is obtained through deceptive and inaccurate testimony). Although we conclude that the dismissal here was with prejudice, we admonish the trial court that an order dismissing an indictment should expressly state whether the dismissal is with or without prejudice, as that distinction carries significant procedural consequences.

¶ 39 Finally, because we affirm the dismissal based on the prejudicial denial of due process concerning "good standing," we need not address whether Juergensen's inaccurate testimony that defendant had been appointed deputy commissioner also constituted a prejudicial due process violation. We likewise need not consider the State's arguments regarding whether the underlying section of the misapplication of funds statute identified in the indictment applies to public contracts or its request to assign a new trial court judge on remand. Additionally, we note that, while this appeal was pending, the State filed a motion to cite additional authority, to which defendant initially objected. We ordered the motion taken with the case. At oral argument, defendant withdrew her objection. In its motion, the State cited *People v. Turuc*, 2025 IL App (2d) 240537-U, ¶¶ 39-40, for the proposition that surplus language included in an indictment need not be proved by the State. However, the State never raised surplusage as part of its legal argument either below

or on appeal. Although we find the cited authority irrelevant, in the absence of an objection, we nonetheless grant the State's motion to cite additional authority.

¶ 40                                    III. CONCLUSION

¶ 41    For the foregoing reasons, the judgment of the circuit court of Lake County is affirmed.

¶ 42    Affirmed.

*People v. Kilkelly*, 2026 IL App (2d) 240776

| | |
|---|---|
| **Decision Under Review:** | Appeal from the Circuit Court of Lake County, No. 24-CF-546; the Hon. Patricia S. Fix, Judge, presiding. |
| **Attorneys for Appellant:** | Eric F. Rinehart, State's Attorney, of Waukegan (Patrick Delfino, Edward R. Psenicka, and Stephanie Hoit Lee, of State's Attorneys Appellate Prosecutor's Office, of counsel), for the People. |
| **Attorneys for Appellee:** | Donald J. Morrison, of Kelleher & Holland, of North Barrington, and Joshua G. Vincent, of Hinshaw & Culbertson LLP, of Chicago, for appellee. |